Betterman *v.* American Stores Company, Appellant.

194

Argued November 21, 1950. Before DREW, C. J., STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

re-argument refused April 17, 1951.

*George M. Spence,* with him *Joseph Gilfillan, Robert H. Shertz, Spence, Custer, Saylor & Wolfe, Gilfillan, Gilpin & Brehman* and *Shertz, Barnes & Shertz,* for appellant.

*Frank A. Sinon,* with him *Philip N. Shettig, Shettig & Swope* and *Rhoads & Sinon,* for appellee.

OPINION BY MR. JUSTICE BELL, March 28, 1951:

Plaintiff, a contract carrier by motor vehicle, brought an action of assumpsit against defendant for the cost of operation plus a reasonable profit guaranteed him under a written contract dated August 30, *1937,* and recovered a verdict of $16,050.13. Defendant appealed from (the judgment on the verdict which was entered following) the lower court's refusal to enter a judgment n.o.v. or to grant a new trial. What is the proper construction of the contract; was the contract legal; was plaintiff's evidence sufficient to establish his case?—These are the most important questions involved in this appeal. From 1200 pages of testimony we shall briefly summarize the important facts.

Plaintiff was employed by defendant as a truck driver commencing in 1933. In 1936 defendant persuaded plaintiff and other truck drivers of defendant to purchase their own trucks and become contract carriers, orally promising plaintiff (and others) that if they did so they would be given steady work and would make a profit and that their earnings would be considerably increased over those they received as ordinary truck drivers. On August 30, 1937, plaintiff and defendant entered into the aforesaid written contract which was prepared by counsel for defendant and was subsequently filed by counsel for defendant with the Public Utility Commission of Pennsylvania. A similar contract was prepared by defendant and executed by it and 31 other truck drivers of defendant at approximately the same time. The contract was for a period of one year, renewable automatically for a further term of one year and so on from year to year unless 15 days'

written notice was given by either party of his or its intention to terminate the same. The agreement provided that the plaintiff (carrier) would furnish a truck suitable to defendant; that *he would be subject to call at any time;* that he would *personally drive* the truck (in the absence of sickness, etc.) ; that his truck would be available for loading and transporting defendant's merchandise at such times and places as defendant should designate; that the transportation was to be within the State of Pennsylvania and the contract was to be subject to the laws, rules and regulations of the proper regulatory bodies. There then followed this very important provision with respect to compensation: "9. The parties mutually agree that the compensation for such service outlined above *shall not be fixed\** but shall vary with the tonnage, mileage, loading and unloading time, number of stops, road and weather conditions. The parties hereto shall from time to time make such adjustments of the compensation as shall be mutually agreed upon by the parties. *Company hereby guarantees to Carrier compensation at least equal to the full cost of operation of the typical or average operator of the same class as Carrier for similar service, plus a reasonable profit. The minimum* of such charges to be paid shall be subject to review, fixing and ascertainment by any regulatory body having jurisdiction thereof."

It will be instantly noted that the *compensation was not fixed* but, because of the indefinite and uncertain services to be rendered by the carrier, the compensation was to vary with a number of varying factors and a cost-plus profit was guaranteed. The importance of this cost-plus clause in the construction of the contract and the question of compensation will hereinafter more fully appear.

---

\* Italics throughout, ours.

Based upon the aforesaid contract, plaintiff, through defendant's counsel, filed an application with the Pennsylvania Public Utility Commission for a contract carrier's permit, which the Commission granted on *November 16, 1937.* On September 30, 1940, defendant, on behalf of plaintiff, filed with the Pennsylvania Public Utility Commission a *schedule of minimum* rates effective November 16, 1937. *This schedule contained the rates based on weight and mileage on a zone basis for two types of commodities.* One of the obvious purposes was to provide plaintiff with some regular compensation for his work as it was performed.

The court below, in a detailed, comprehensive and very able opinion, held—and we agree—that under said contract of 1937 plaintiff was entitled to "the full cost of operation . . . plus a reasonable profit."

The conduct of both plaintiff and defendant clearly indicates that the parties believed and intended the contract of *1937* to be binding. Not only did the plaintiff so testify, but (a) in *1943* defendant brought an action against plaintiff upon the aforesaid contract of *1937* in which it *averred that said contract was still in full force and effect;* and (b) on February 1, *1944,* defendant and plaintiff entered into a supplemental written agreement amending (in immaterial matters) "the *present* contract entered into between the parties hereto dated the 30th day of August *1937*" and reaffirming and ratifying said contract of August 30, 1937. How then is it possible for defendant to *now* maintain that the parties *intended* to abrogate the contract of 1937 and supersede it by the rates filed with the Pennsylvania Public Utility Commission?

Defendant nevertheless contends that the minimum, maximum and only compensation *legally* payable to plaintiff is that which is in accord with the schedule of rates or charges filed with the Pennsylvania Public

Utility Commission; and that (an agreement to pay or) the payment of a larger sum would be illegal. No authority is cited, and we have found none, to support defendant's contention. On the contrary, the Pennsylvania Public Utility Law throughout, and especially in Section 802 (a), 66 P. S., Section 1302, Section 809 (a), 66 P.S., Section 1309; and Section 810, 66 P.S. Section 1310, all refer to *minimum* rates. For example, Section 802 (a) provides: "The commission shall have the power . . . . to regulate contract carriers by motor vehicle . . . . and to that end the commission *may prescribe minimum rates* which are just and reasonable . . . . ." Section 809 (a) provides: ". . . . No such contract carrier shall engage in the transportation of passengers or property, unless the *minimum charges* for such transportation by such carrier have been filed with the commission, *or copies of all contracts* reduced to writing and filed with the commission. *No reduction shall be made in any charge* . . . . No such carrier shall . . . . charge, or collect a *less* compensation for such transportation than the charges filed in accordance with this section . . . . or by any other device whatsoever, to charge, accept or receive *less than the minimum* charge so filed . . . ." Section 810 empowers the Commission upon complaint or its own motion to *"prescribe minimum rates"*. No authority is conferred upon the Commission to fix maximum, or maximum and minimum rates of a contract carrier. It follows, therefore, that an agreement of a contract carrier which provides for minimum and maximum rates (cost plus reasonable profit) is not a violation of the Pennsylvania Public Utility Law, especially since in no event could the rates charged by the contract carrier fall below the schedule of minimum rates filed with the Commission.

The purpose of prescribing minimum rates for contract carriers by the Pennsylvania Public Utility Commission₅ was to protect common carriers from cutthroat competition and price-cutting on the part of the contract carriers, as well as to protect the contract carriers from cut-throat competition and price-cutting among themselves. It was felt, and properly so, that such price-cutting or the charging of an unreasonably *low minimum* rate would likely result in the deterioration of equipment and the increase of hazards to the public.

This case was further complicated by the fact that plaintiff claimed for the cost of operation plus reasonable profit for merchandise transported by him *outside* of Pennsylvania under the guarantee clause of the aforesaid contract of *1937*. Defendant prepared and filed with the Interstate Commerce Commission an application for a license for plaintiff, *together with an accompanying contract* made between defendant and plaintiff dated December 4, *1939*. Defendant in this contract guaranteed plaintiff 500,000 pounds of merchandise for transportation during the year. The contract also provided that the compensation for the transportation of such merchandise should be *2¢ per ton mile* and further provided that *"Nothing in this agreement shall prevent the Company from paying the Carrier reasonable additional compensation* based upon and varying with the type of service, the flow of tonnage and territory involved and served."* Defendant contends that the agreement of *1939* was intended to apply to all transportation *outside* of Pennsylvania and that the plaintiff could legally recover only 2¢ per ton mile. The court below held, and we believe correctly so, that the contract and the schedule of rates

---

* See paragraph 8 of said agreement.

and charges filed with the Public Utility Commission and with the Interstate Commerce Commission (1) related only to *minimum* rates and (2) were filed in order to comply with the requirements of each of said Commissions. But the court also found, as did the jury under proper instructions, that the plaintiff and defendant intended the plaintiff to be compensated for both intra-state and inter-state transportation in accordance with the terms of the guarantee set forth in the aforesaid contract of *1937*. A written agreement may be modified, of course, by a subsequent oral agreement and this modification may be shown by words or conduct, or both. *Knight v. Gulf Refining Company,* 311 Pa. 357, 361, 166 A. 880. "It is an elementary proposition that any contract can be modified with the assent of both contracting parties, provided, of course, the modification does not conflict with law or public policy." *Friday v. Regent Improvement Co.,* 330 Pa. 481, 485, 199 A. 914. Of course, the subsequent modification must be clearly established. *Stoner v. Sley System Garages,* 353 Pa. 532, 534, 46 A. 2d 172.

There was sufficient evidence on the question of modification to take the case to the jury. In the first place, the plaintiff and his witnesses testified that it was the intention of the parties, and that they had agreed, that contract carriers would be compensated for both intra-state and inter-state transportation as provided by the *1937* agreement; in the second place the acts and conduct of the defendant corroborated this understanding. For example, the defendant *never* paid the plaintiff 2¢ per ton mile as fixed by the said contract of *1939*. On the contrary, the uncontradicted evidence showed that all transportation *outside* of Pennsylvania was paid for by defendant under the zone rate schedules filed with the Public Utility Com-

mission under the contract of *1937*. Furthermore, the 7½% overall increases and minimum load guarantees agreed upon by plaintiff and defendant in *1946* were applied by both parties *equally to intrastate and interstate transportation*. Perhaps most convincing of all, defendant in the detailed record which it kept of plaintiff's transportation services, expenses, etc., *did not segregate* the intra-state and the inter-state hauls or the expenses or payments due under each. It seems too clear for argument that if defendant believed plaintiff was entitled to a specific compensation for transportation services *within* Pennsylvania and to a *different* compensation for transportation services in *inter-state* commerce, it would have *kept a separate record* of and paid plaintiff a different compensation for each of said services. It is also clear that the agreement of *1939* was intended not only to provide for a minimum compensation but also for *additional compensation* for plaintiff. Moreover, as we have seen, defendant in *1943* sued on the contract of *1937* which it said was then still in effect and binding upon the parties; and in *1944* defendant executed an amendment to the *1937* contract. The jury found from adequate evidence and under proper instructions, that the parties intended that the plaintiff was entitled to the cost of operation plus a reasonable profit for both intra-state and inter-state transportation.

Defendant makes the same legal contention with respect to the rates filed with the Interstate Commerce Commission that it made with respect to those filed with the Pennsylvania Public Utility Commission, namely, that *they were the only charges or rates which could legally be collected*. Regardless of any technical violation by plaintiff of the Interstate Commerce Act the present suit of the plaintiff does not violate the public policy expressed by said Act since plaintiff is

making *no attempt to collect less than the minimum rates* on file with the Commission, but rather to collect the *additional compensation guaranteed by his 1937 contract* with this defendant and impliedly referred to in their *1939* contract.

The Interstate Commerce Commission is concerned with *minimum* rates for contract carriers. Throughout the Interstate Commerce Act* every contract carrier by motor vehicle must "establish and observe reasonable *minimum* rates and charges"; he must file with the Commission "schedules containing the *minimum* rates or charges"; and throughout the provisions pertaining to contract carriers all the language refers to *minimum* charges. The Commission itself recognized in its decisions that *it was concerned solely with minimum* charges, and prohibiting the payments or acceptance of payments *below the minimum* rates fixed in the schedules filed: see Ex Parte No. MC-9, 2 M. C. C. 55. In this opinion, the Commission said: "No need exists as to such carriers for protecting the public against exorbitant charges because the contracting shippers are well able to protect their own interest in this respect. The *patent object of Congress is to protect common carriers against cut-throat competition*": Ex Parte No. MC 12, 2 M. C. C. 628, 629.

*Bottemueller v. Wilson & Co.,* 57 Fed. Supp. 766 and *Gardner v. Rich Manufacturing Company,* 158 Pac. 2d. 23, cited by defendant, are clearly distinguishable. Each of them involved a situation where the contract carrier accepted payments *below the minimum rates* fixed in the schedule filed with the Interstate Commerce Commission. The following excerpt from the opinion in the *Bottemueller* case is illuminating (p.

---

* Part 2, section 218, enacted August 9, 1935, C. 498, 49 Stat. 561, as amended, 49 U. S. C. A., section 318, 49 Fed. Code Ann., section 318.

768) : "It was the hauling service that he performed for the defendant and not the statute which gave him the right to claim compensation. All the statute did was to regulate and fix the amount of compensation to be charged and to *forbid the plaintiff* from collecting a *lesser* amount."

That brings us to the next question: was the evidence to prove plaintiff's case sufficient? Plaintiff claims that he is entitled under the contract of *1937* to a "compensation at least equal to the full cost of operation of the typical or average operator of the same class as carrier for similar service plus a reasonable profit." We have already decided that this is the correct construction of said contract. However, the parties vigorously disagree as to what is meant by the "full cost of operation"; what is a "typical or average operator"; "of the same class as carrier"; and what is meant by the words "similar service"; and "a reasonable profit."

It becomes necessary, therefore, to determine what is meant by this controversial clause and whether plaintiff's evidence was adequate. We must remember that plaintiff was a truck driver without a lawyer, and the contract was prepared by defendant's able, experienced lawyer. If, therefore, the contract, or any part of it, is susceptible of two reasonable constructions, "It is an elementary proposition that a written contract should, in case of doubt, be interpreted against the party who has drawn it; 6 R. C. L. page 854, Sec. 242; White vs. Smith, 33 Pa. 186." *Hempfield Township School District vs. Cavalier,* 309 Pa. 460, 463, 164 A. 602.

" 'The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles.' [citing cases] 'Con-

tracts must receive a reasonable interpretation, according to the intention of the parties. . . . if that intention can be ascertained from their language.' " *Brown vs. Raub,* 357 Pa. 271, 287, 54 A. 2d. 35.

" '. . . . in order to ascertain that intention, the court may take into consideration *the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement*': Slonaker v. P. G. Publishing Co., 338 Pa. 292, 296, 13 A. 2d. 48, 50, 51." *Hindman v. Farren,* 353 Pa. 33, 35, 44 A. 2d. 241.

How do these principles apply to the facts which were proved in this case? The jury could have found from the evidence, and the contract itself discloses, that the conditions sought to be covered by the contract were so unusual, indefinite, varying, uncertain and unforeseeable; the subject matters involved such as the different kinds, nature and weight of commodities and merchandise; the services to be performed at call; the unknown destinations and uncertain times of performance; and all the surrounding facts and circumstances necessarily made it impracticable and probably impossible to clearly and with particularity specify in the agreement any detailed method of ascertaining the compensation. The contract itself in effect said that the compensation could not be fixed in advance because of so many uncertain and unknown factors.

Plaintiff offered evidence to prove *the actual cost of operations* on a yearly basis of half a dozen contract carriers, who, according to the evidence were typical or average and in the same class and rendered similar service as plaintiff, in that they all hauled about the same load irrespective of the size or weight of their trucks, and they all did approximately the same transportation work; and then the plaintiff struck an aver-

age cost of operations therefrom. Defendant alleges that this was an incorrect method of ascertaining cost.

Defendant does not allege what particular yardstick should be adopted but says that the clause in question means, if it means anything, "the full operating cost for a reasonable unit of service rendered, such as a ton mile or a zone ton or some other reasonable unit." In other words, defendant admits the clause is capable of any one of several constructions; but not the construction placed upon it by plaintiff. Defendant's theories and arguments as to a reasonable interpretation of each element in this clause are, when applied to the facts and attendant circumstances, specious but impractical, unreasonable and unsound. The court below found that the record was replete with testimony showing the impracticability, if not impossibility, of figuring out costs on any ton mile or zone ton or other unit basis. No one could reasonably expect a truck driver to keep books on any such basis. If a cost accountant had been employed by a truck driver to compute costs per ton mile or per zone ton, he would have had to qualify every figure he arrived at by explaining that this figure was a cost per ton mile for hauling certain commodities in certain loads over certain routes with the figures changing and varying with different commodities, loads, roads and weather conditions. That would be ridiculous. On the other hand, taking as plaintiff did, the total costs of half a dozen typical carriers on a yearly or other basis and then averaging the cost would give a reasonable, practical and substantially accurate measure of the full cost of operation within the meaning and intent of paragraph 9 of the agreement of *1937*.

Defendant next contended that a typical or average operator was one whose truck weight was for licensing purposes the same as plaintiff's. This theory is re-

futed first by the facts, and secondly by the testimony. For example, only *one* of the eighteen contract carriers serving defendant under the original agreement operated a "U" truck, and only one a "V" truck, and only one a "ZZ" truck. Under defendant's theory these carriers could recover no guaranteed cost and profit under the contract of 1937 because there could not be a typical or average operator in their class. Moreover there was testimony that the six witnesses for plaintiff all took about the same load as plaintiff, irrespective of the weight or size of their truck; and there was likewise sufficient evidence (giving plaintiff as we must on a motion for judgment n.o.v. the benefit of every fact and every reasonable inference of fact arising therefrom and viewing the testimony in the light most advantageous to the plaintiff)* to enable the jury to find that these witnesses were typical or average contract carriers of the same class as plaintiff and that they rendered similar service.

Defendant also contended that the court below erred in holding (1) that the testimony of plaintiff and his witnesses as to the estimated time devoted to serving the defendant under their contracts was admissible; and (2) that plaintiff was entitled to compensation for himself in computing his cost; and (3) that the Union wage scale was applicable and therefore admissible as an element of cost in computing plaintiff's own allowable salary or cost; and (4) that the testimony of plaintiff's certified public accountant was admissible; and (5) that plaintiff's evidence was sufficient to make out a prima facie case for the jury.

Defendant attacked most vigorously the admissibility of the testimony of plaintiff's certified public ac-

---

* *McDonald v. Ferrebee*, 366 Pa. 543; *Welch v. Sultez*, 338 Pa. 583.

countant who had examined and testified with respect to the costs of the aforesaid six contract carriers in the same class as plaintiff. Proof of the costs of operation and a reasonable profit in an unusual case such as this would obviously be difficult, and the problem must necessarily be approached from a practical and reasonable consideration of the situation of the parties, the nature of the subject matter of the contract and all the surrounding circumstances, as well as the objects the parties had in view. Taking into consideration all of these factors and elements, the testimony of plaintiff's certified public accountant was both admissible and adequate. See Wigmore on Evidence Third Edition, Section 1230, pages 434-437.

The rule with respect to a claim for compensation for services rendered and accepted is well stated in *Lach v. Fleth,* 361 Pa. 340, 352, 64 A. 2d 821: "The law does not require that proof in support of claims for damages or in support of claims for compensation must conform to the standard of mathematical exactness. In Western Show Co., Inc. v. Mix, 308 Pa. 215, 162 A. 667, we held that *evidence* in support of a claim for damages *was sufficient 'if it afforded a reasonably fair basis'* for calculating the plaintiff's loss. The same rule applies when the claim is for compensation for services rendered and accepted. If the facts afford a reasonably fair basis for calculating how much plaintiff is entitled to such evidence cannot be regarded as legally insufficient to support a claim for compensation." See also to the same effect, *Weinglass v. Gibson,* 304 Pa. 203, 155 A. 439; and *Osterling v. Frick,* 284 Pa. 397, 131 A. 250.

We find no merit in these or in any other contentions made by defendant, all of which we have considered but deem it unnecessary to discuss. We believe that plaintiff's construction of the contract was reasonable; that the contract was legal; that considering

208

the extraordinary circumstances and conditions involved in this contract, plaintiff's proof was sufficient to establish his claim; and that substantial justice was rendered in this unusual case.

Judgment affirmed.