**SUNNYVALE WESTINGHOUSE SALA-RIED EMPLOYEES ASSOCIATION**
and
**Federation of Westinghouse Independent Salaried Unions, Plaintiffs,**

v.

**WESTINGHOUSE ELECTRIC CORPO-RATION, Defendant.**

**Civ. A. No. 17018.**

United States District Court
W. D. Pennsylvania.
Aug. 18, 1959.

Albert C. Shapira, Pittsburgh, Pa., for plaintiffs.

John G. Wayman, of Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant.

GOURLEY, Chief Judge.

Union and Employer are in dispute regarding the arbitrability of a grievance under the collective bargaining agreement executed by said parties.

Union sues in the District Court under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185, in accordance with the rule of Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972.

From the stipulated facts and oral testimony it appears that the collective bargaining agreement as modified contains a detailed grievance procedure for the settlement of disputes and for the arbitration of certain types of grievances which remain unsettled after the grievance procedure has been exhausted. Not every matter is arbitrable without the consent of both sides and there are express limitations on the authority of the arbitrator. Where there is disagreement as to the arbitrability of any grievance this issue must be determined by the court before the matter can proceed to arbitration.

The issues before the court are:

(1) Whether the grievance involves the interpretation, application or claimed violation of a provision of the agreement, and

(2) whether any provision of the contract precluded an arbitrator from acting in the grievance.

After a full, complete and exhaustive hearing, I conclude the grievance is not arbitrable under the modified collective bargaining agreement.

History or Background of Proceeding

Employer is a Pennsylvania corporation having its principal office in Pittsburgh, Pennsylvania, and having plants and factories in many states of the United States, including one in Sunnyvale, California.

Union represents certain employees of Employer at various places throughout the United States, and some 700 salaried, clerical and technical employees at the Sunnyvale plant.

Union and Employer entered into a written collective bargaining agreement effective November 1, 1950, covering wages, hours and certain other conditions of employment. Contract was amended and supplemented from time to time, the currently effective amendment being dated October 15, 1955 and was in effect at all times material to this action.

The contract contains a detailed procedure for processing any "grievance." A grievance is defined in the contract as any dispute as to the interpretation, application or claimed violation of the contract, or any subject that the contract specifies may become a grievance, or any question involving discipline, release or discharge of employees covered by the contract.

On or about February 18, 1957, Union filed a grievance on behalf of an employee union member named Jane Graham, and asserted that since June 1, 1956 said employee was "group leading" without group leader pay, and claimed such pay retroactive to June 1, 1956.

In an exchange of correspondence and after a series of meetings as prescribed in the grievance procedure, Employer denied the grievance and Union supported it, with the result that it was not resolved by the grievance procedure.

On or about August 19, 1957, Union notified Employer that it was referring the Graham grievance to arbitration under Section XV–A:

"A. Except as otherwise provided in this Agreement, any grievance involving action taken or a failure to act subsequent to October 28, 1955, which remains unsettled after the grievance procedure has been exhausted pursuant to Section XV and which involves either

"(1) the interpretation, application or claimed violation of a provision of this Agreement or of a local supplement in effect in the bargaining unit in which the grievance arose, or

"(2) a disciplinary penalty, release or discharge which is alleged to have been imposed without just cause,

shall be submitted to arbitration upon the written request of either the Federation or the Company."

On or about September 9, 1957, Employer answered saying that the grievance was not arbitrable and declining to arbitrate.

The exchange of correspondence of August 19 and September 9 brought into play Subsection D of Section XV–A, which reads:

"D. The American Arbitration Association shall have no authority to process a request for arbitration or appoint an arbitrator if either party shall advise the Association that the grievance desired to be arbitrated does not, in its opinion, raise an arbitrable issue. In such event, the Association shall have authority to process the request for arbitration and appoint an arbitrator in accordance with this Agreement and the above-mentioned Rules only after a final judgment of a Court has determined that the grievance upon which the arbitration has been requested raises an arbitrable issue or issues."

Following Employer's notification of September 9, 1957, Union, on or about May 26, 1958, jointly brought this action to compel arbitration of the Graham grievance.

### Plant Operations

The Sunnyvale plant is a rather large one, covering some fifty-three acres and roughly square in shape. It is made up of a number of buildings and areas and contains a number of areas in which materials are stored.

Transportation of materials between the various buildings and areas of the plant is accomplished by a crew of men, between 30 and 40 in number, known as the "yard crew."

The yard crew is made up of "jeep" drivers, truck drivers, crane operators, hook-ons and locomotive operators. The men in the yard crew are members of the Teamsters union and are covered by a separate collective bargaining agreement.

In moving materials the yard crew uses and operates jeeps, which are motorized fork lift trucks, flat bed automobile trucks of various sizes, self-propelled cranes, and a gasoline locomotive that operates over some three miles of track within the plant.

The supervisor of the yard crew is a foreman, excluded from the bargaining unit. His office is roughly in the middle of the plant. He spends much of his time travelling throughout the plant to areas where men in the crew are working, actually riding a bicycle to get from one such area to another.

The yard foreman normally is in the plant only on the day shift, although he is "on call" at all times. At night those of the crew who work are under a group leader who is a teamster and a member of the Teamster union, and for about four years prior to November 1956, Jane Graham was a record clerk in the yard foreman's office.

Some time prior to June 1, 1956, Employer decided to install a two-way radio communications system for transmission of requests for movement of materials to jeep or truck drivers, crane operators and locomotive operators, just as a taxicab dispatcher uses his two-way radio system, and although Union was fully informed in advance of the installation of this system no objection was made thereto.

Jane Graham was assigned to transmit requests for movement of material to the drivers and operators and receive inquiries from them beginning about June 1, 1956. Use of the radio equip-

ment involved additional duties for Jane Graham. Neither Employer nor Union was sure exactly what these new duties involved in June, so it was agreed that she would go ahead and do the work, and the parties would observe it and agree upon an adjustment in pay later on. This continued for a period of approximately six months.

Finally, the parties agreed upon the description of the job, called "yard office clerk" and at Union's insistence negotiated a salary increase.

The agreed upon description of the job was as follows:

"Primary function: Receives requests either personally or by telephone, for movement of materials by radio-controlled equipment. Transmits requests by radio-telephone to operators of equipment.

"Working Procedure and/or Responsibility Assigned: Records on Form SV 5665 requests for transportation of materials. Transmits requests in order of requirement to drivers of equipment. Must know weight-carrying capacity of equipment. Uses judgment in routing requests to drivers in order to fully utilize equipment.

"Performs other clerical functions necessary in yard office.

"Scope, Purpose and Frequency of Contacts: Extensive contact with drivers and plant personnel requesting service.

"Direction of Others: None

"Direction Received: Works under the direct guidance of supervisor.

"Pre-Employment Requirements:

"1. Education: High school or equivalent. Restricted Radio-Telephone permit required.

"2. Experience: General knowledge of department functions, transportation equipment and general plant layout."

There was no change in these duties after the description and salary were negotiated, and since the negotiation agreement Jane Graham has received requests from various departments for movement of materials; she has transmitted those requests to the drivers of the equipment; she has requested that they use one type of equipment rather than another, that they haul certain materials rather than other materials; she has informed them of the location of materials or equipment in various parts of the plant; she has used judgment in substituting equipment in the event of a breakdown.

Jane Graham stays in the yard office at all times. She has no personal contact with drivers of the equipment, she does not operate jeeps, trucks, cranes or locomotives and need not know how. She ordinarily does not see these operators and has never been designated by Employer as group leader, nor has Employer designated the radio-controlled equipment operators a group.

Union concedes that Employer has the unilateral right to decide whether or not there shall be a group and whether or not there shall be a group leader and that the attempts in 1957 contract negotiations to procure the right to participate in the selection of a group leader, and in the formation, division or discontinuance of groups, were unsuccessful, as were the attempts to have the restrictions on arbitration removed from the contract.

The term "job classification" represents the end product of describing the duties of the job, assigning an appropriate job title, evaluating the elements of the job, and assigning a wage or salary rate. It is the combination of all these factors, no one of which is in itself a "job classification."

A job classification is customarily identified by the job title. The code number merely serves as a means by which the job title, job description, job evaluation and salary range may be discovered.

The job description of "group leader" is contained in the contract, Section VI–C(1), and is as follows:

"A group leader is a non-supervisory employee who is a working member of a group, without disciplinary authority, who works under a minimum of supervision, who regularly leads, instructs and guides employees in the group, and who generally allocates the work."

The job of "group leader" never exists alone, but only in combination with other jobs, since the group leader by definition must be a working member of the group he leads. It is a status in addition to the other job, consisting of additional duties for which the group leader receives additional pay.

The job of "group leader" has a job description, a job title, its elements have been evaluated, and salary rates set according to the evaluation. It is a job classification to which employees are promoted.

Union seeks to have an arbitrator declare that by performing the agreed upon duties of yard office clerk Jane Graham is necessarily a group leader; to direct that Employer designate her a group leader; and to order Employer to pay her an additional ten percent retroactive to June 1, 1956.

### Law Applicable

█ The prime function of the court in construing any contract is to ascertain the intention of the parties. In order to ascertain that intention, the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement. Wilson v. Homestead Valve Manufacturing Co., 3 Cir., 217 F.2d 792, 797; Slonaker v. P. G. Publishing Co., 338 Pa. 292, 296, 13 A.2d 48; Betterman v. American Stores Co., 367 Pa. 193, 80 A.2d 66; Silverstein v. Hornick, 376 Pa. 536, 103 A.2d 734.

It is true that a collective bargaining agreement is a different kind of a contract than that usually before a court, but the same sound principles of law and equity that enable a court to correctly interpret other contracts will produce a correct interpretation of a collective bargaining agreement.

In determining arbitrability the court is not obliged to shut its eyes to the realities of the situation, nor is it obliged to ignore any facts that may shed light on the intention of the parties, or their real motives or ends.

█ The court may, and it should, consider all of the facts relating to the dispute that may shed light on the intention of the parties to submit to or withhold the matter from arbitration. Davenport v. Proctor & Gamble Mfg. Co., 2 Cir., 241 F.2d 511, 63 A.L.R.2d 1350.

█ In construing the provisions of the Federal Arbitration Act, after determining that the parties have entered into an arbitration agreement, the duty of the court is to determine whether any of the issues raised in the suit are within the reach of that agreement. This duty cannot be adequately performed unless the court examines the facts upon which the demand for arbitration is based as those facts relate to the language of the agreement. Engineers Ass'n v. Sperry Gyroscope Co., 2 Cir., 251 F.2d 133; Kulukundis Shipping Co., S/A v. Amtorg Trading Corp., 2 Cir., 126 F.2d 978.

█ It seems both reasonable and well settled that unions in suits such as these have the burden of proving the existence of an arbitrable dispute by proven facts, not merely charges or claims. Engineers Ass'n v. Sperry Gyroscope Co., supra; General Electric Co. v. United Electrical, Radio & Machine Workers, 300 N.Y. 262, 90 N.E.2d 181; Application of Berger, 191 Misc. 1043, 78 N.Y.S.2d 528.

This does not necessarily mean that Union must prove the case that would be submitted to the arbitrator, but it must establish proven facts sufficient to satisfy the court that its claim has a genuine foundation.

Thorough consideration of the question of arbitrability by the court is essential. Requiring an unwilling party to submit a dispute to arbitration rather than the courts deprives him of important rights and protections.

The nature of the tribunal where suits are tried is an important part of the parcel of rights behind a cause of action. The change from a court of law to an arbitration panel may make a radical difference in ultimate result. Arbitration carries no right to trial by jury, there is no benefit of judicial instruction on the law; they need not give reasons for their results; the record of their proceedings is not as complete as it is in a court trial; and judicial review of a trial. Wilko v. Swan, 346 U.S. 427, 435–438, 74 S.Ct. 182, 98 L.Ed. 168; Bernhardt v. Polygraphic Co. of America, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199.

■ Is it conceivable that these parties intended that after they sat down and negotiated an agreed upon rate for performing certain duties, after full disclosure and six months of observation, they intended to leave open for submission to an arbitrator the question of how much more the employee should be paid for performing those same duties? No such intention is to be discovered in this contract, and no such intention can be written into it by interpretation. The restrictions upon arbitrability written in the contract show that the parties clearly intended that an arbitrator should not have jurisdiction over wages, job classifications, classification of employees, etc. The court should honor the expressed intention of the parties.

It is my considered judgment that it would be a departure from the letter and provisions of the contract in this proceeding to conclude that the dispute presented is arbitrable under the terms and provisions of the collective bargaining agreement.

### Findings of Fact

1. Defendant, Westinghouse Electric Corporation, hereinafter referred to as "Employer", is a Pennsylvania corporation having its principal office in Pittsburgh, Pennsylvania, and having plants and factories in many states of the United States, including one in Sunnyvale, California. It is engaged in interstate commerce.

2. Plaintiff, Sunnyvale Westinghouse Salaried Employees Association, hereinafter referred to as the "Association", is a local labor union affiliated with and a member of the plaintiff, Federation of Westinghouse Independent Salaried Employees Association.

3. The Federation represents certain employees of the Employer at various places throughout the United States. The Association represents some 700 salaried, clerical and technical employees at the Sunnyvale plant.

4. The Employer, the Federation and the affiliates, including the Association, entered into a written collective bargaining agreement effective November 1, 1950 covering wages, hours and certain other conditions of employment of employees of the Employer represented by the Federation and its affiliates. This agreement, for convenience referred to as the "contract", was amended and supplemented from time to time, the most recent and currently effective amendment being dated October 15, 1955. The contract as so amended was in effect at all times material to this action, and is the basis for the plaintiffs' complaint.

5. The contract contains a detailed procedure for processing any "grievance". A grievance is defined in the contract as any dispute as to the interpretation, application or claimed violation of the contract, or any subject that the contract specifies may become a grievance, or any question involving discipline, release or discharge of employees covered by the contract.

6. On or about February 18, 1957, the Association filed a grievance on behalf of an employee named Jane Graham, a member of the Association.

7. The grievance asserted that since June 1, 1956, Jane Graham was "group leading" without group leader pay, and

claimed such pay retroactive to June 1, 1956.

8. In an exchange of correspondence and after a series of meetings as prescribed in the grievance procedure of the contract, the Employer denied the grievance and the Association and Federation supported it, with the result that it was not resolved by the grievance procedure.

9. In another section of the contract, added by the supplement of October 15, 1955, there is a provision for submission of certain grievances to arbitration in the event they are not settled in the grievance procedure. This provision, Section XV–A, reads in its pertinent parts as follows:

"A. Except as otherwise provided in this Agreement, any grievance involving action taken or a failure to act subsequent to October 28, 1955, which remains unsettled after the grievance procedure has been exhausted pursuant to Section XV and which involves either

"(1) the interpretation, application or claimed violation of a provision of this Agreement or of a local supplement in effect in the bargaining unit in which the grievance arose,

"(2) a disciplinary penalty, release or discharge which is alleged to have been imposed without just cause,

shall be submitted to arbitration upon the written request of either the Federation or the Company.

\* \* \* \* \* \*

"E. Notwithstanding any other provisions of this Agreement, no arbitrator shall, without specific written agreement of the Company and the Federation with respect to the arbitration proceeding before him, be authorized to:

"1. Add to, detract from, or in any way alter the provisions of this Agreement or any Supplement or local supplement to this Agreement;

"2. Establish or modify any wage or salary rate, job classification, the classification of any employe, or any incentive time value;

\* \* \* \* \* \*

"5. Make any award requiring payment to an employe for any period more than thirty (30) days preceding the filing of the grievance."

10. On or about August 19, 1957, the Federation notified the Employer that it was referring the Graham grievance to arbitration under Section XV–A.

11. On or about September 9, 1957, the Employer answered saying that the grievance was not arbitrable and declining to arbitrate.

12. The exchange of correspondence of August 19 and September 9 brought into play Subsection D of Section XV–A, which reads:

"D. The American Arbitration Association shall have no authority to process a request for arbitration or appoint an arbitrator if either party shall advise the Association that the grievance desired to be arbitrated does not, in its opinion, raise an arbitrable issue. In such event, the Association shall have authority to process the request for arbitration and appoint an arbitrator in accordance with this Agreement and the above-mentioned Rules only after a final judgment of a Court has determined that the grievance upon which the arbitration has been requested raises an arbitrable issue or issues."

13. Following the Employer's notification of September 9, 1957, the Federation and the Association, on or about May 26, 1958, jointly brought this action under Section 301 to compel arbitration of the Graham grievance.

14. The only issue disclosed by the pleadings, at the trial or by the briefs, requests and stipulations, is whether or not under this contract the Employer is compelled to arbitrate the Graham grievance.

15. The Sunnyvale plant is a rather large one, covering some fifty-three acres and roughly square in shape. It is made up of a number of buildings and areas and contains a number of areas in which materials are stored.

16. Transportation of materials between the various buildings and areas within the plant is accomplished by a crew of men, between 30 and 40 in number, known as the "yard crew."

17. The yard crew is made up of "jeep" drivers, truck drivers, crane operators, hook-ons and locomotive operators. The men in the yard crew are members of the Teamsters union and are covered by a separate collective bargaining agreement.

18. In moving materials the yard crew uses and operates jeeps, which are motorized fork lift trucks, flat bed automobile trucks of various sizes, self-propelled cranes, and a gasoline locomotive that operates over some three miles of track within the plant.

19. The supervisor of the yard crew is a foreman, excluded from the bargaining unit. His office is roughly in the middle of the plant. He spends much of his time travelling throughout the plant to areas where men in the crew are working, actually riding a bicycle to get from one such area to another.

20. The yard foreman normally is in the plant only on the day shift, although he is "on call" at all times. At night those of the crew who work are under a group leader who is a teamster and a member of the Teamster union.

21. For about four years prior to November 1956, Jane Graham was a record clerk in the yard foreman's office.

22. Some time prior to June 1, 1956 the Employer decided to install a two-way radio communications system for transmission of requests for movement of materials to jeep or truck drivers, crane operators and locomotive operators, just as a taxicab dispatcher uses his two-way radio system.

23. The Association was fully informed in advance of the installation of this system and made no objection to it.

24. Jane Graham was assigned to transmit requests for movement of material to the drivers and operators and receive inquiries from them beginning about June 1, 1956.

25. Use of the radio equipment involved additional duties for Jane Graham. Neither the Employer nor the Association were sure exactly what these new duties involved in June, so it was agreed that she would go ahead and do the work, and the Employer and the Association would observe it and agree upon an adjustment in pay later on.

26. The trial or observation period lasted about six months, during which time the president of the Association himself visited the job some six or eight times.

27. Finally about November 9, 1956, the Employer and the Association agreed upon the description of the job, called "yard office clerk" and at the Association's insistence negotiated a salary increase from code 3 to code 5 for it.

28. The agreed-upon description of the job is as follows:

"Primary function: Receives requests either personally or by telephone, for movement of materials by radio-controlled equipment. Transmits requests by radio-telephone to operators of equipment.

"Working Procedure and/or Responsibility Assigned: Records on Form SV 5665 requests for transportation of materials. Transmits requests in order of requirement to drivers of equipment. Must know weight-carrying capacity of equipment. Uses judgment in routing requests to drivers in order to fully utilize equipment.

"Performs other clerical functions necessary in yard office.

"Scope, Purpose and Frequency of Contacts: Extensive contact with drivers and plant personnel requesting service.

"Direction of Others: None

"Direction Received: Works under the direct guidance of supervisor.

"Pre-Employment Requirements:

"1. Education: High school or equivalent. Restricted Radio-Telephone permit required.

"2. Experience: General knowledge of department functions, transportation equipment and general plant layout."

29. There has been no change in these duties since the description and salary were negotiated in November.

30. Since June 1, 1956 Jane Graham has received requests from various departments for movement of materials; she has transmitted those requests to the drivers of the equipment; she has requested that they use one type of equipment rather than another, that they haul certain materials rather than other materials; she has informed them of the location of materials or equipment in various parts of the plant; she has used judgment in substituting equipment in the event of a breakdown.

31. All of the things Jane Graham has done since June 1, 1956 are comprehended in the job description of "yard office clerk."

32. Jane Graham has had no authority whatsoever to put her requests in the form of an order or directive. She cannot and could not require any person receiving the request to comply with it. The most she could do was report to the foreman, who had the authority to give and enforce orders.

33. Jane Graham stays in the yard office at all times. She works only on day shift, as does the foreman. She has no personal contact with drivers of the equipment, she does not operate jeeps, trucks, cranes or locomotives and need not know how. She ordinarily does not even see these operators.

34. The Employer has never designated Jane Graham to be a group leader, nor has it designated the radio-controlled equipment operators a group.

35. The Association and Federation concede that the Employer has the unilateral right to decide whether or not there shall be a group and whether or not there shall be a group leader.

36. The Federation attempted in 1957 contract negotiations to procure the right to participate in the selection of a group leader, and in the formation, division or discontinuance of groups, but did not succeed in its attempt.

37. The Federation in 1957 through negotiations attempted to have the restrictions on arbitration removed from the contract, but did not succeed in its attempt.

38. The term "job classification" represented the end product of describing the duties of the job, assigning an appropriate job title, evaluating the elements of the job, and assigning a wage or salary rate. It is the combination of all these factors, no one of which in itself is a "job classification."

39. A job classification is customarily identified by the job title. The code number merely serves as a means by which the job title, job description, job evaluation and salary range may be discovered.

40. The job description of "group leader" is contained in the contract, Section VI-C(1), and is as follows:

"A group leader is a non-supervisory employee who is a working member of a group, without disciplinary authority, who works under a minimum of supervision, who regularly leads, instructs and guides employes in the group, and who generally allocates the work."

41. The salary of the group leader job is also set forth in the contract.

42. The job of "group leader" never exists alone, but only in combination with other jobs, since the group leader by definition must be a working member of the group he leads. It is a status in addition to the other job, consisting of additional duties for which the group leader receives additional pay.

694

43. The job of group leader has a job description, a job title, its elements have been evaluated, and salary rates set according to the evaluation. It is a job classification to which employees are promoted.

44. Plaintiffs seek to have an arbitrator declare that by performing the agreed-upon duties of yard office clerk Jane Graham is necessarily a group leader; to direct that the Employer designate her a group leader, and to order the Employer to pay her an additional ten percent retroactive to June 1, 1956.

45. In order to grant the plaintiffs' request, an arbitrator would necessarily change the job classification of yard office clerk to that of yard office clerk group leader.

46. In order to grant the plaintiffs' request, an arbitrator would necessarily change the wage rate agreed upon by the parties for performance of the duties of yard office clerk.

47. In order to grant the plaintiffs' request, an arbitrator would necessarily add to, detract from or alter the terms of the contract by granting the Federation or Association the right to determine when there shall be a group leader, and to eliminate restrictions on arbitrability, both of which are contract changes that the Federation sought unsuccessfully to obtain through negotiation.

48. In order to grant the plaintiffs' request, an arbitrator would have to disregard the specific limitation of Section XV-A, D5 that he may not make any award retroactive for more than thirty days preceding filing of the grievance.

49. The claim is not bona fide, but seeks to increase the pay for work that was studied for six months before being assigned a rate agreed upon by Employer and Union.

## Conclusions of Law

1. The Court has jurisdiction of this action.

2. Under the terms of the collective bargaining agreement and the applicable law, the Court and not the arbitrator is called upon to determine whether or not these disputed matters are arbitrable.

3. Under the terms of the collective bargaining agreement and under the law, the Jane Graham grievance is not arbitrable.

4. The complaint must be dismissed.

An appropriate order shall be submitted by counsel for the defendant on or before the 25th day of August, 1959, in accordance with the findings of fact and conclusions of law herein stated.