439 A.2d 621

INTERNATIONAL ORGANIZATION MASTER, MATES AND PILOTS OF AMERICA, LOCAL NO. 2, an Unincorporated Organization by Edmund H. Stoughton and Samuel J. Schweigert, Thomas N. Reed, Dec'd, Arthur W. Smith, Weldon J. Lucas, Charles C. Devos, Willard S. King, Leon Cohen, J. Francis, Sibre, Peter Petruncio, Newton E. Zartman, H. C. D. Vickers

v.

INTERNATIONAL ORGANIZATION MASTERS, MATES AND PILOTS OF AMERICA, INC., a Corporation, Morris Weinstein, Alleged Trustee, International Organization Masters, Mates and Pilots, Local No. 2, C. T. Atkins, President of International Organization Masters, Mates and Pilots of America, Inc., John J. Handley, Treasurer and Trustees of International Organization Masters, Mates and Pilots Pension and Welfare Plan, A Trust.

Appeal of Edmund H. STOUGHTON, Samuel J. Schweigert, Arthur W. Smith, Weldon J. Lucas, Williard S. King, Peter Petruncio, Newton E. Zartman & H.C.D. Vickers at No. 266.

Appeal of Leon COHEN, Charles C. Devos and Thomas N. Reed, Deceased, by Mildred E. Reed, Executrix at No. 267.

Supreme Court of Pennsylvania.

Argued Oct. 26, 1981.

Decided Dec. 17, 1981.

Reargument Denied Jan. 29, 1982.

104

Wilfred F. Lorry and Stephen L. Hymowitz, Philadelphia, for Stoughton et al.

Kip D. Denega, Jr. and S. Jay Sklar, Philadelphia, for Cohen et al.

Melvin Alan Bank, James J. Leyden, Ann Schmerling-Salsburg, Burton M. Epstein, James D. Crawford, Marvin Schwartz, Philadelphia, for appellees.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY, KAUFFMAN and WILKINSON, JJ.

## OPINION

NIX, Justice.

Once again we are called upon to resolve a dispute concerning the rights and obligations of the parties to this long and involved litigation which has been the subject of numerous court proceedings during the last twenty-five years. The underlying facts were set forth in our opinion, reported at 456 Pa. 436, 318 A.2d 918 (1974):

In 1956 twelve members of Local 2 of the defendant union, International Organization of Masters, Mates and Pilots of America, instituted an action in equity against the union for improper expulsion. Preliminary objections were sustained by the trial court which held that its jurisdiction was preempted by that of the National Labor Relations Board. This Court overturned that ruling and remanded the case, 414 Pa. 277, 199 A.2d 432 (1964), *cert. denied*, 379 U.S. 840 [85 S.Ct. 76, 13 L.Ed.2d 46] (1964). Trial was had under a bifurcated procedure, on the issue of liability and, after two years, the defendant union was adjudged liable and a date for the trial on the damages issue was set.

Approximately two weeks after the assessment of damages proceeding began, a settlement was agreed upon by the union and eleven of the twelve plaintiffs, and on June 23, 1971, the decree was formally signed and filed. This decree commanded that the defendant union should make such payments to the Union's Pension and Welfare Plan as necessary to give the plaintiffs their normal pension according to the schedule set down in the decree. The date for such payment was July 1, 1971. On the appointed day the defendant union failed to comply with the

provisions of the consent decree. The plaintiffs, appellants here, then filed a Petition for Contempt Citation wherein they prayed that the court hold defendant-appellees in contempt, direct them to comply forthwith with the consent decree, and impose an appropriate fine. The employer and union designated trustees of the pension fund were joined as party defendants in this contempt action pursuant to Pa.R.C.P. 2232 and the employer trustees unsuccessfully attempted to remove the case to the federal district court. The lower court, after a hearing, denied the contempt petition without opinion. This appeal was taken from that order. [Footnotes omitted.]

*I.O.M.M. & P. of A., Local No. 2 v. I.O.M.M.P. of A.*, 456 Pa. 436, 438–440, 318 A.2d 918, 920–21 (1974).

In that opinion, we held that the International Organization Masters, Mates and Pilots of America, Inc. (Union), appellees herein, could not avoid the enforcement of a consent decree [1] based upon their allegation that it was conditional and subject to approval by the Board of Trustees of the Pension Plan.

On remand pursuant to our Order, appellants contended that the appellees were not fully funding the Pension Plan as required by the Consent Decree,[2] and in addition, were

1. The Consent Decree is set forth in its entirety in Appendix A.

2. Initially, the union intended to receive approval for its consent decree funding proposal from the Pension Plan Board of Trustees. The Board consisted of an equal number of union-trustees and employer-trustees. When the proposed funding level of approximately $200,000 was offered to the full board, the employer-trustees unanimously rejected the proposal as actuarially unsound. The employer-trustees determined that in order to fund the requirements of the Consent Decree, the union would have to pay to the plan approximately $800,000.

After several unsuccessful attempts to break the voting deadlock, and the action of this Court holding the Consent Decree to be binding, the union unilaterally established its own special checking account in the Marine Midland Bank located in New Jersey. Each month, the union forwards checks drawn from this account to the Pension Plan office. The Pension Plan then mails the check and a letter identifying the payment on Pension Plan stationary to appellant-pensioners. Thus, under the present system, the Pension Plan acts merely as a "conduit" for each month's payment.

denying appellants the right to participate in health, medical and other benefits which are provided to all other union pensioners pursuant to the union's established Pension Plan. President Judge Bradley of the Court of Common Pleas of Philadelphia rejected appellant's request for relief and the Superior Court affirmed without opinion, per curiam.

The crux of the present appeal is whether the Consent Decree provides appellants with identical benefits to those union members under the M.M.&P. Pension Plan or whether the Consent Decree was intended to confer upon appellants a special status wherein their pension benefits were less than those that all other union members receive.

Appellants contend that the Consent Decree requires the union to pay into the established M.M.&P. Pension Plan (Plan) "... such full payments ... *as are necessary* for the various plaintiffs *to be qualified for and to receive pensions* from the [M.M.&P.] ... Plan ..." Since the M.M.&P. Pension Plan provides health and welfare benefits, appellants assert they are entitled to the same.

Appellees, on the other hand, contend that the Consent Decree merely requires that appellants receive the specific monetary amounts as listed in the schedule and that the Consent Decree was never intended to return appellants to the status of full union pensioners.

 Moreover, appellees assert that the "conduit" structure of funding is a completely proper and sound method of paying the specific monetary amounts listed in the Consent Decree. It is clear that in interpreting the terms of a consent decree, rules of contract interpretation apply. *Universal Builders Supply, Inc. v. Shaler Highlands Corp.*, 405 Pa. 259, 175 A.2d 58 (1961); *Dulles v. Dulles*, 369 Pa. 101, 85 A.2d 134 (1952). "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles." *Foulke v. Miller*, 381 Pa. 587, 593, 112 A.2d 124, 127, (1955); citing *Betterman v. American Stores Co.*, 367 Pa. 193, 80 A.2d 66 (1951). In construing a contract

the intention of the parties must be ascertained from the entire instrument and each and every part of it must be taken into consideration and given effect if reasonably possible. *Foulke v. Miller, supra.* However, "[w]here a written contract is ambiguous or conflicting, or its meaning is doubtful or obscure, parol evidence is admissible to clarify the ambiguity and to resolve the doubts, in order to determine the intention of the parties." *Foulke v. Miller, supra,* 381 Pa. at 593, 112 A.2d at 127. Moreover, "in order to ascertain that intention, the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement." *Id.* Upon examination of the Consent Decree, it is clear that an ambiguity exists as to the proper inclusion of pension benefits. Section I seems to indicate that appellees must pay to the M.M.&P. Pension Plan a sufficient sum of money in order to qualify appellants to receive pensions from the Plan. Under the M.M.&P. Pension Plan, appellants would be entitled to health and welfare benefits *in addition* to specific monthly payments.

However, appellees argue that the term "pension" as used in the Consent Decree is qualified to and limited by the specific monthly payments as listed in the schedule.

To state the matter more succinctly, appellants define the term "pension" to mean a monthly payment of money as well as other related health and welfare pension benefits contained in the M.M.&P. Pension Plan, whereas appellees contend that the term "pension" is the equivalent of a monthly payment of money and is limited to the schedule contained in the Consent Decree.

Therefore, in order to ascertain the intention of the parties, we must look to the Decree itself as well as other indicia of the parties circumstances.

In Section I of the Consent Decree the appellees must make "such *full payments* . . . to the Pension Plan *as are necessary* for the various plaintiffs to be qualified for and to receive pensions from the . . . Plan." It is clear from the language of this section that two things must occur. Appel-

lants must be *qualified for* the pensions and also *must receive* pensions from the Plan.

There is nothing in this section to indicate that the benefits to be received by appellants would be different from all other union member pensioners who were then fully qualified members.

■ In addition, in the Schedule which follows Section I, numerous references are made to "*normal*" monthly pensions. Unless reference is being made to the terms of the Pension Plan, the use of the term "normal" would be superfluous and meaningless. Therefore, it is obvious that reference was being made to the established Pension Plan. The established Pension Plan provides "qualified pensioners" with health and welfare benefits *in addition* to the normal monthly payments as set forth under the Plan. When construing an ambiguous contract which by necessary implication refers to another document, the court may look to such document as additional evidence of surrounding circumstances in order to ascertain the intention of the parties. *Trapuzzano v. Lorish*, 467 Pa. 27, 354 A.2d 534 (1976). The Consent Decree itself does not include a definitional section. Under the M.M.&P. Pension Plan booklet and the M.M.&P. Welfare Plan booklet, however, the following sections are pertinent to a determination as to the definition of an individual who is "qualified for" and "receives" a pension from the M.M.&P. Pension Plan:

1. Section 8. *Pensioner.* "*Pensioner* means the person who receives *pension benefits* under the Pension Plan. (Record 33a);

2. "Dear Member: We are pleased to present you with this new booklet which describes in detail *all the benefits to which you are entitled* under the MMP Pension Plan." (Record 336a). (Emphasis added).

3. WELFARE *BENEFITS FOR PENSIONERS.*

A. Death Benefits. Upon the death of a *pensioner* who has retired under the MMP Pension Plan, a death *benefit* of $1,000.00 will be paid to the *pensioners* designated beneficiary...

B. Hospital and Medical Expense-*Pensioners* Under Age 65. If a *pensioner* of his dependents (wife or parent if pensioner is unmarried) incurs hospital or medical expenses, the welfare plan provides reimbursement for those expenses similar to those provided under the Federal Social Security Medicare Program...." (Record 346a).

4. "MMP WELFARE PLAN RULES AND REGULATIONS."

As amended to September 18, 1970. Article I. Definitions.... Section 9. "The term '*pensioner*' shall mean a person who receives a *pension* under the MMP Pension Plan." (Record 349a);

5. Article XII. *Benefits for pensioners.* "The following *benefits* shall be available to Pensioners eligible for *pension* under the MMP Pension Trust...." (Enumeration of Death Benefits, Health and Welfare Benefits similar to Medicare, etc.); (Emphasis added). (Record 350a).

Under the definitions and relevant provisions of the MMP Pension Plan, it is apparent that a "qualified" pensioner receives substantial health and welfare benefits in addition to a monthly payment of money.

Section II of the Consent Decree requires appellees to pay to the Plan such contributions as are necessary to pay a "*death benefit*" to the estate of an appellant who had died during the pendency of the litigation. Section II does not specify the dollar amount of the death benefit. Quite clearly, once again, resort must be had to the Pension Plan Rules and Regulations to determine the amount of this death benefit.

■ The "Welfare Benefits for Pensioners" contained in the MM&P Pension Plan provide as follows:

Death Benefit

Upon the death of a pensioner who has retired under the MM&P Pension Plan a death benefit of $1,000. will be paid to the pensioners designated beneficiary....

This amount is what was in fact paid to the decedent's beneficiary in the instant case. Moreover, the correspondence prior to execution of the decree sheds light on the parties' intention. Prior to execution of the Consent Decree, one of the attorneys for appellants wrote to Judge Bradley requesting clarification of the terms of the proposed consent decree. The letter in pertinent part stated:

... [I]t is understood that any general increase in pension *benefits* will also result in a similar raise in *benefits* to be received by the [appellants]. Naturally, if there is any corresponding diminution in *benefits*, I advised [appellants] that they would be subject to that also. (R.R. 29a) (emphasis added).

In response thereto, Judge Bradley responded in pertinent part:

... I can confirm that [appellants] will not be discriminated against with respect to changes in the pension benefits to be paid by Master, Mates and Pilots.

(R.R. 301a)

Again, it is clear that the benefits provided for in the Consent Decree were necessarily intended to relate to and be consistent with the benefits provided MM&P Pension Plan.

■ Moreover, the fact that only dollar amounts were specifically indicated is not dispositive of the contention that only monetary payments were intended. Due to the lapse of time between the filing of the complaint in equity (1956) and the acceptance of the Consent Decree, a determination of the base-line dollar figure of monthly payments was considered of great importance to appellants. Because years of service correlate with anticipated monthly payments a specific dollar figure for each appellant was necessary. On the other hand, most health and welfare benefits are afforded pursuant to the fact of one being a pensioner, not according to years of service. Therefore, the explicit recitation of such obvious complimentary benefits was deemed unnecessary.

■ As previously stated, the court, in order to ascertain the parties' intention, may take into consideration the sur-

rounding circumstances, the situation of the parties, the objects they apparently have in view, and the subject matter of the agreement.

The instant litigation arose out of the illegal expulsion of appellants as members of the I.O.M.M.&P. Union. After protracted litigation it was finally determined that the union was liable for damages to appellants. As the Decree and Order of Settlement states, appellants claimed damages for the following:

1. Damages for mental pain and suffering, humiliation, worry and degradation;
2. Punitive damages;
3. The economic loss of:
 a. past and future loss of wages, and
 b. substantial and valuable pension and welfare rights and benefits.

Appellants were seeking several types of damages. They settled for a small percentage of claimed damages.

■ In addition, because appellants were wrongfully deprived of their union status from 1956 until 1977, it would be absurd to assume that they would agree to accept anything less than an equal pension position to other union members that were not subjected to such illegal expulsion. For these reasons, we hold that the Consent Decree must provide appellants with the same pension benefits as they would have received had they not been illegally expelled from the union.

■ In addition, we hold that Section I of the Consent Decree is quite clear in its direction to the union to pay into the MMP Pension Plan such funds as are actuarially necessary to insure that appellants will receive their full pension benefits. We recognize that in our prior decision the employee-trustees were not a party to the instant litigation and cannot be compelled to accept pension funding from the union which the employer-trustees find actuarially unsound.

Therefore, if voluntary agreement cannot be made between the union and the employer-trustees, the union may

continue to maintain the special bank account which is presently maintains, provided that *this* account is funded with a sufficient amount of money to insure actuarial soundness consistent with the benefits to which appellants are entitled.

Finally, appellants make claim for counsel fees and costs of the additional litigation over the validity of the Consent Decree. As we have stated:

> 'Over and over again we have decided there can be no recovery for counsel fees from the adverse party to a cause, in the absence of express statutory allowance of the same . . .', *Smith v. Equitable Trust Co.*, 215 Pa. 413, 417, 64 A. 591, 592 (1906), or clear agreement by the parties, *Fidelity-Philadelphia Trust Company v. Philadelphia Transportation Company*, 404 Pa. 541, 548, 173 A.2d 109, 113 (1961), or some other established exception, see *Hempstead v. Meadville Theological School*, 286 Pa. 493, 134 A. 103, 49 A.L.R. 1145 (1926). *Shapiro v. Magaziner*, 418 Pa. 278, 20, 210 A.2d 890, 892 (1965).

> *Chatham Com. Inc. v. General Press Corp.*, 463 Pa. 292, 300–01, 344 A.2d 837, 842 (1975).

Appellants cite *Hempstead v. Meadville Theological School*, 286 Pa. 493, 134 A. 103 (1926) for the proposition that they are entitled to counsel fees under the "common fund" exception to the rule in this Commonwealth against awarding counsel fees.

In *Hempstead*, we explained the "common fund" exception:

> . . . [W]here many persons have a common interest in a trust property or fund, and one of them, for the benefit of all, at his own cost and expense, brings suit for its preservation or administration, the court of equity in which suit is brought will order plaintiff to be reimbursed his costs and expenses, including counsel fees, from the property of the trust, or order those benefited to contribute proportionately toward that expense.

> 286 Pa. at 497, 134 A. at 104.

■ The instant case does not fall within the "common fund" exception. Appellants seek a determination as to the proper benefits as provided for in the Consent Decree. This was not the creation of a fund but a determination of an entitlement to benefits pursuant to the Consent Decree.

Moreover, the "common fund" exception is narrowly applied and is usually invoked to protect the administration of estates or corporate property from illegal or fraudulent waste or dissipation when the "fund" itself is before the court.

■ The lower court acted properly when it determined that the instant action was an "honest dispute" and in denying the award of counsel fees for the successful litigation concerning the validity and construction of the Consent Decree.

The Order of the Superior Court is reversed and the cause is remanded for further proceedings consistent herewith.