In the Matter of James B. CAREY, as President of International Union of Electrical Radio and Machine Workers, AFL-CIO, Appellee,

v.

GENERAL ELECTRIC COMPANY, Appellant.

No. 222, Docket 27652.

United States Court of Appeals Second Circuit.

Argued Jan. 23, 1963.

Decided March 11, 1963.

David L. Benetar, of Nordlinger, Riegelman, Benetar & Charney, New York City (Thomas F. Hilbert, Jr., H. H. Nordlinger, Robert C. Isaacs, New York City, of counsel), for appellant.

Lieberman, Katz & Aronson, New York City, and Benjamin C. Sigal, Washington, D. C. (Isadore Katz, New York City, on the brief), for appellee.

Before FRIENDLY, KAUFMAN and MARSHALL, Circuit Judges.

KAUFMAN, Circuit Judge.

This case comes before us on cross appeals from the disposition by Judge Palmieri, in the United States District Court for the Southern District of New York, of a petition to compel arbitration of twelve labor grievances. The International Union of Electrical, Radio and Machine Workers, AFL-CIO, through its president, James B. Carey, instituted this proceeding in the New York Supreme Court, and the defendant, General Electric Company, elected to remove the case to the District Court by invoking section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185. See 28 U.S.C. §§ 1441, 1446. The grievances in question arise under the collective bargaining agreement between General Electric and the union, as well as certain local supplement agreements controlling in various plants throughout the country. Over the employer's objections that these grievances were without the jurisdiction of the arbitrator for several reasons—failure to comply with procedural conditions precedent, express exclusion from arbitration in the collective agreement, conflict with the exclusive jurisdiction of the National Labor Relations Board—Judge Palmieri, in a thorough opinion, ordered that the merits of all grievances except one be submitted for determination to the arbitrator. General Electric Company, hereafter referred to as the employer, asserts that Judge Palmieri erred in submitting any issues to arbitration; the union, in its cross appeal, asserts that he erred in withholding the one grievance from arbitration.

We modify and affirm the order of the District Court on the appeal of General Electric, and reverse the ruling of the court on the union's cross appeal.

## I.

We shall first dispose of those objections to arbitration which rest upon the assertion that the union or the grieving employee failed to take timely action as stipulated in the collective bargaining agreement. Article XIII of the collective agreement establishes a three-step grievance procedure for the peaceful resolution of individual grievances. It provides that a grieving employee, within a reasonable time after the occurrence or knowledge of the aggrieving condition, may complain of it to his foreman or other immediate supervisor. If unresolved, the grievance may be carried to the second stage, presentation by a local union official to a representative of local management. If no settlement is reached after step two, the grievance may be referred by union "headquarters", the National Officers, to management "headquarters," an Executive Officer of the company. The collective bargaining agreement further provides that the step-three submission to the company shall be made "not more than three months after the completion of discussions and the final decision of local Management at Step Two."

The relevant portions of the arbitration provisions (Article XV) stipulate that "any grievance which remains unsettled after having been fully processed pursuant to the provisions of Article XIII, and which involves * * * the interpretation or application of a provision of this Agreement * * * shall be submitted to arbitration upon written request of either the Union or the Company, provided such request is made within 30 days" after a step-three decision

by the company officials. Article XV-2 (a) continues, "Within 10 days following a written request for arbitration of a grievance, the Company or the Union may request the American Arbitration Association to submit a Panel of names from which an arbitrator may be chosen."

The employer contends that two grievances—National Docket Nos. 4910 and 4928, both involving an employee's assertion that he has rightful claim to a position presently occupied by a junior employee—have been rendered nonarbitrable because not presented by the employee "within a reasonable time after the occurrence or knowledge of the situation * * *". The employer alleges that four and two years, respectively, transpired between the occurrence of the events complained of and the presentation of the grievance. The union answers that the presentation was timely in each case, because the senior employee did not know of the aggrieving condition for the extended time period in question and because each filed his grievance immediately upon learning of it.

Two other grievances—National Docket Nos. 3970 and 3971, consolidated as one in the union's petition to compel arbitration—spring from the laying off of two individuals whom the company refused to recognize any longer as stewards after it placed two groups of employees under a single foreman. The company claims that these grievances have been rendered nonarbitrable by the union's failure to comply with step three of the grievance procedure, which as we have seen requires reference to company headquarters within three months after a step-two decision by local management. The union justifies its non-compliance with the three month provision on the ground that resolution of the identical substantive issue was then pending in another arbitration proceeding; this, claims the union, was sufficient to warrant abeyance of the grievance procedure here.

Of seven grievances,[1] the employer contends that the union failed timely to request a panel from the American Arbitration Association within ten days from the date of a written request for arbitration. The union seeks to justify the untimely request by the fact *inter alia*, that the Association will automatically and without request submit a list of potential panel members for the arbitral tribunal. The union also asserts that the ten-day limitation was merely permissive and was not a mandatory condition precedent to arbitration, and that the provision has been effectively ignored for many years.

Judge Palmieri, noting the split of authority on whether compliance with purported conditions precedent was to be determined by the court or by the arbitrator, held that questions of "procedural arbitrability" requiring some special expertise or familiarity with plant conditions and practices would be determined by the arbitrator, but reserved for the courts "questions that do not call for this special competence, as, for example, where the contract provides in specific rather than general terms the procedural requirements and the consequences of non-compliance." He accordingly submitted to arbitration the questions: whether an employee had presented his grievance "within a reasonable time" after occurrence or knowledge thereof, and whether the union's delinquency in invoking step three of the grievance procedure was excused by the pendency of arbitration proceedings. He reserved for himself the question whether the union's failure to request an arbitration panel was rendered immaterial by the automatic furnishing of such a list by the American Arbitration Association. He answered the question in the affirmative, and finding no procedural impediment to arbitration of the seven grievances involved, ordered that they be submitted to arbitration.

■ At the time of Judge Palmieri's decision, this Court had been silent on the

1. National Docket Nos. 4454, 4601–11, 4665, 4910, 4922, 4928, 5039. No. 4454 protests the assignment of apprentices to jobs of laid-off craft helpers. The facts of the remaining six grievances are set out in other parts of this opinion.

question of procedural arbitrability. Our silence on this difficult problem in labor law has since been broken by the clear and positive language of Livingston v. John Wiley & Sons, Inc., 313 F.2d 52 (2d Cir. Jan. 11, 1963). Holding that the question of compliance with conditions precedent was a matter solely for the arbitrator to decide, Judge Medina, speaking for a unanimous court, noted that

"It is of the essence of arbitration that it be speedy and that the source of friction between the parties be promptly eliminated. * * * The numerous cases involving a great variety of procedural niceties * * make it abundantly clear that, were we to decide that procedural questions under an arbitration clause of a collective bargaining agreement are for the court, we would open the door wide to all sorts of technical obstructionism."

The Court continued:

"It is for this reason that we cannot agree to the distinction propounded by Judge Palmieri in his very excellent discussion in Carey v. General Electric Co. * * * between matters of procedural compliance requiring the expertise of the arbitrator for decision and those which the courts are capable of deciding on their own. If the court must first decide whether a particular procedural problem calls for the special abilities and knowledge of an arbitrator, there will be inevitable delay. Such a practice, if followed, would develop a whole new body of decisional law, with the usual distinctions and refinements. Moreover, we have serious doubts that the suggested distinction between different types of procedural questions arising out of the arbitration clauses in collective bargaining agreements can be placed upon any tenable and rational basis. In any event, it is clear that the practical consequences of attempts by the courts to apply such a distinction would be delay and prejudice to the speedy and effective arbitration which we believe the national policy calls for."

We need add little to what has already been said in the Livingston case. The difficulties involved in the dichotomy suggested by Judge Palmieri are clearly evident in the very case before us. Even were we to assume that contract conditions precedent could, on their face, be divided into those whose terminology is open-ended, warranting the arbitrator's special competence for interpretation, and those well-defined provisions meet for judicial interpretation, we would often have to go further, and characterize the union's reasons for non-compliance. Thus, it was determined below that the three-month provision involved in National Docket Nos. 3970 and 3971 was specific, but that the union's defense of pending proceedings "requires a consideration of factors more appropriate for the arbitrator." If the court must characterize not only the contract provision asserted to be a condition precedent but also each of the union's justifications or excuses for untimeliness, the arbitral wheels would very soon grind to a halt.

As noted in Livingston, the premise underlying Judge Palmieri's scheme of characterization is also subject to question; for what is a "specific" contract term? If, as an illustration, an employee must take certain action "within five days," does this not raise the question whether the parties to the collective bargaining agreement intended that the measuring rod be working days rather than calendar days; or, whether the period was intended to be tolled for certain occurrences, such as a strike; or, whether the five-day restriction was illusory under any circumstances, because customarily ignored in the plant?

We therefore affirm that portion of Judge Palmieri's order which submitted to arbitration the "procedural" aspects of Docket Nos. 4910, 4928, 3970, 3971, reverse that portion of his order holding that the union was excused from making a timely request for a panel of

arbitrators, and order that the latter question be submitted to the arbitrator for decision.

## II.

The company's second attack upon the union's attempt to secure arbitration employs as its weapon Article XV-3(b) of the collective bargaining agreement, which the company asserts excludes from arbitration six of the union's grievances. The specific facts of the grievances in question, to be recited below, make it quite clear that they fall within the broad language of Article XV-1(a): "Any grievance which remains unsettled after having been fully processed pursuant to the provisions of Article XIII [the three-step grievance procedure], and which involves * * * the interpretation or application of a provision of this Agreement * * * shall be submitted to arbitration upon written request of either the Union or the Company. * * *" Although conceding, for the most part, that the grievances under discussion fall *prima facie* within the "interpretation or application" clause,[2] the company claims that arbitration is barred by the language which follows soon after, in Article XV-3(b):

> "It is specifically agreed that no arbitrator shall have the authority to establish or modify any wage, salary or piece rate, or job classification or authority to decide the appropriate classification of any employee. Subject to the foregoing limitations on the authority of an arbitrator, nothing in this subsection (b) shall prevent arbitration of a grievance involving a violation of this Agreement."

National Docket No. 3830 protests the company's action in reducing the pay rate of two employees. The union claims that these employees, who had been classified as R-17 Millwrights for approximately nine years, temporarily worked in a lower classification during a heavy layoff. Thereafter, when they returned to perform the duties they had originally performed as Millwrights, they were classified merely as Machine Repairmen R-12, and paid at a lower rate. The company asserts that resolution of this grievance would require the arbitrator to determine proper wages and job classifications.

National Docket No. 4485 involves a refusal by the company to reinstate an employee as a sheet metal worker, despite his seniority rights, on the ground that he was physically unable to perform the work. The union alleges that the employee, who had worked as a sheet metal worker for approximately eight months, was laid off because of lack of work; when other employees with less seniority were recalled, he was told that he could not be placed in his former job because of his physical condition. The employee had been examined by the company's dispensary and found to be epileptic. His reclassification was effected apparently on the basis of a provision in the collective bargaining agreement: "An employee with a physical limitation as determined by the Company Dispensary will be transferred to a suitable available classification * * *." The company contends that arbitral review of its action here would require the arbitrator to determine proper job classification.

National Docket No. 4557 protests the promotion of an employee, one Haslam, to an R-14 opening despite the claim to the job by another employee, Hatch, who, the union contends, had greater seniority rights. Haslam, at one time employed within the bargaining unit represented by the union, was transferred to another job outside the unit. The union contends that upon returning to the unit he was improperly given seniority credit, despite his shift to a position outside the unit and despite the fact that the job

---

2. The company objects to arbitration of National Docket No. 3830 as not involving the interpretation or application of a contract provision, and to arbitration of National Docket No. 4485 as involving a matter within the sole authority of the company. We reject these contentions for the reasons set out in Judge Palmieri's opinion.

he had previously held in the unit was no longer in existence. The company claims, *inter alia,* that to resolve this grievance, the arbitrator would have to determine the proper classification of an employee.

National Docket No. 4665 involves the company's hiring of employees as No. 1762 Testmen, which carried an R–19 classification, but paying them merely R–16 rates. The union claims that the company's continued refusal to advance their wages runs afoul of the collective bargaining agreement, especially the progression schedules. The company defends its refusal to arbitrate by asserting that the arbitrator is without authority to establish or modify job classifications or wages, or to determine the appropriate classification of an employee.

National Docket No. 4922 protests the removal of employees from the production and maintenance unit, represented by the union, and the conversion of their jobs from hourly pay to salary without any change in their duties. It is alleged that the company's removal of the No. 8323 Crystal Processors, R–10, violated that section of the collective bargaining agreement providing for union recognition, as well as other contract provisions, and that several of the employees were later laid off in violation of their rights. The company objects to arbitration as necessarily involving the decision of appropriate job classifications.

National Docket No. 5039 involves an allegation of improper retroactive deductions from the earnings of sixteen employees who were transferred to experimental jobs. When two employees complained that their earnings on the experimental job were less than their average earnings on their regular job, the company paid them the difference. There-

after, the company recomputed the wages of twenty-three other employees on the experimental job and found that sixteen had been earning more on that job than their average earnings on their regular job. The excess earnings were thereupon deducted from later pay checks. The grievance complains of these retroactive deductions. The company asserts that the grievance is nonarbitrable, for the arbitrator is without authority to modify wages.

■ The scope of our power in determining questions of "substantive arbitrability," that is, whether the subject matter of a grievance is such as to make it properly submissible to arbitration under the agreement of the parties, has been clearly set out by the Supreme Court. "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582–583, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). "In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad." Ibid. at 584–585, 80 S.Ct. at 1354. We have before us such a broad arbitration clause, bringing within its ambit all cases involving " 'the interpretation or application of any provision of' the agreement * * *."[3]

■ Although the company asserts that all six grievances just described are

---

**3.** This Court, recently construing precisely such a clause said:

"The nub of the matter is that under the broad and comprehensive standard labor arbitration clause every grievance is arbitrable, unless the provisions of the collective bargaining agreement concerning grievances and arbitration contain some clear and unambiguous clause of exclusion, or there is some other term of the agreement that indicates beyond peradventure of doubt that a grievance concerning a particular matter is not intended to be covered by the grievance and arbitration procedure set forth in the agreement." Procter & Gamble Independent Union v. Procter & Gamble Mfg. Co., 298 F.2d 644, 645–646 (2d Cir., 1962).

rendered beyond the jurisdiction of the arbitrator by Article XV-3(b), the union contends that the limitations there set out upon the authority of the arbitrator do not deprive him of jurisdiction but merely circumscribe his award-making powers by restricting the remedies which he may fashion after deciding the merits of a grievance. We agree, as did Judge Palmieri, with the union's construction of the so-called exclusionary clause, and we hold therefore that none of these grievances is excluded from arbitration by virtue of its substantive nature. This conclusion is compelled by the structure of the section itself, a comparison with other provisions in the collective bargaining agreement, and an understanding of the arbitration clause in the context of labor relations between the union and the employer.

The first sentence of Article XV-3(b) limits the "authority" of the arbitrator; the second provides that subject to these limitations, all grievances involving a violation of the collective bargaining agreement are to be arbitrable. The more plausible reading of the Article on its face is therefore that all grievances involving "interpretation or application" are within the *jurisdiction* of the arbitrator, but that the arbitrator's jurisdiction must be exercised subject to the stipulated limitations upon his award-making *authority*. At the worst, this Article is ambiguous; but as we have just noted, in order that arbitration be excluded, the exclusionary clause must be "clear and unambiguous."

Any ambiguities are readily dissipated by an examination of the subsections of Article XV which surround the subsection under investigation. Article XV-3(c) states that "no provision of this Agreement * * * *shall be subject to arbitration* pertaining in any way to the establishment, administration, interpretation or application of Insurance or Pension Plans * * *." (Emphasis added.) It is clear that the parties were quite able, by the use of appropriate language, to provide for exclusion from arbitration altogether by withdrawing from the arbitrator's jurisdiction certain specific subject matter. The use of different phraseology within the very same Article of the collective bargaining agreement cannot be ignored in the process of construction.[4] Article XV-3(a), on the other hand, uses terminology similar to that of the section here under investigation: "no arbitrator shall have any authority to add to, detract from, or in any way alter the provisions of this Agreement." This provision seems clearly to be a limitation upon the arbitrator's award-making powers, for it apparently assumes that a dispute will indeed be submitted to him. The use here of the word "authority" guides us toward a similar interpretation when it appears in the very next subsection of Article XV.

Finally, we are persuaded that Article XV-3(b) does not deprive the arbitrator of jurisdiction over these six grievances, because of the broad possibility of labor dislocation which would result from such a construction. All of the grievances

4. We note at this point that the cases upon which the company relies in asserting that Article XV-3(b) renders these grievances wholly nonarbitrable are cases where the exclusionary language left no doubt that arbitration was meant to be completely foreclosed. See Communications Workers of America v. New York Tel. Co., 209 F.Supp. 389 (S.D.N.Y. 1962) ("In no event shall any grievance or dispute arising out of this Section * * * be subject to the arbitration provisions of this agreement."); Underwood Corp. v. Local 267, International Union of Elec. Workers, 183 F.Supp. 205 (D.Conn.1960) (Clark, Circuit Judge, sitting by designation) ("There may not go beyond Step 3 of the grievance procedure to arbitration any difference * * * arising under any provision of Section 16 * * *."). But see Sunnyvale Westinghouse Salaried Employees Ass'n v. Westinghouse Elec. Corp., 175 F.Supp. 685 (W.D.Pa.1959), aff'd 276 F.2d 927 (3rd Cir., 1960), the authority of which is considerably weakened by Radio Corp. of America v. Association of Professional Eng'r Personnel, 291 F.2d 105 (3d Cir.), cert. denied, 368 U.S. 898, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961).

under discussion are what we have called "the run-of-the-mill, garden variety of grievances commonly presented for solution by the procedures of arbitration in the modern American industrial world. * * * " Procter & Gamble Independent Union v. Procter & Gamble Mfg. Co., 298 F.2d 644, 645 (2d Cir., 1962). To hold that such grievances were meant to be excluded from the broad arbitration provision would remove the possibility of compelled peaceful resolution of the type of grievance so pervasive today. We therefore endorse the conclusions of Judge Palmieri, 213 F.Supp. at 276.

■ We do not say that labor and management are no longer free to retain the strike as a means of settling industrial disputes or to limit the scope of arbitration to a minimal number of issues in the collective bargaining agreement. We have recently emphasized that arbitration is not an incident of the employment relationship, but is a creature of contract between the union and the employer. See Black-Clawson Co. v. International Ass'n of Machinists, 313 F.2d 179 (2d Cir. 1962); Procter & Gamble Independent Union v. Procter & Gamble Mfg. Co., 312 F.2d 181, 184 (2d Cir. 1962). What we do say is that the canons for construing labor agreements, as set down by the Supreme Court, require that such a broad-reaching exclusion as is urged by the company should be garbed in unmistakably clear language.

■ The company urges that our reading of the clause limiting the arbitrator's powers renders that clause ineffectual and meaningless. We do not agree. The clause was obviously designed to prevent the arbitrator from making the type of decision which is normally reserved for the parties at the bargaining table. Thus, the arbitrator cannot establish wage rates or job classifications where none existed before and cannot modify those rates and classifications which have been hammered out at the bargaining table. Nor can he assign an unclassified employee to a particular job classification. Such remedies partake more of "legislation" than adjudication, and our reading of the limiting clause merely gives effect to the parties' apparent intention to restrain the arbitrator from exercising a legislative function. The employer argues that the arbitrator necessarily "establishes or modifies" a wage rate or job classification whenever he declares improper some wage or job decision of the employer; in short, that there is an unauthorized "modification" whenever the arbitrator suggests a change in the status quo. We cannot adopt such a construction of the limiting clause. If a change in the status quo is necessitated by an interpretation of the collective bargaining agreement, then it is not an unauthorized modification. The employer's construction of a similar provision was recently rejected by the Court of Appeals for the Third Circuit in Radio Corp. of America v. Association of Professional Eng'r Personnel, 291 F.2d 105, 109 (3d Cir.), cert. denied, 368 U.S. 898, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961),[5] and International Union of Elec. Workers v. Westinghouse Elec. Corp., 268 F.2d 352, 355 (3d Cir., 1959).[6]

■ Even were we to agree with the employer's contention that certain of the grievances might result in an unauthorized "decision" as to the "appropriate classification of any employee," we do not deem that proper cause for interceding at this point. Arbitration may well con-

---

5. "The arbitrator's ruling on this dispute as to the amount of merit increases would thus merely enforce a contractual scheme of escalation. Certainly, if a contract provided for a wage increase of 5% at the end of a year and the employer granted only a 4% increase at that time, an award of the difference could not be characterized as action changing an existing wage rate or establishing a new one."

6. "In reaching these conclusions the arbitrator would neither be establishing new time values or modifying the present ones. He would be merely declaring what the particular actual time value situations are by correct interpretation of the existing written collective bargaining agreement."

tribute to industrial peace even if it results in the arbitrator's determination that he can make no valid award because of the limitations upon his authority, or that the employee has no case on the merits. In United Steel Workers v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), the Supreme Court submitted to arbitration a grievance which was asserted by the employer to be clearly frivolous; one factor in its decision was the "therapeutic" value which arbitration might have in the "plant environment." See 363 U.S. at 568, 80 S.Ct. 1343. We cannot divine now, nor do we deem it proper to predict, the precise form in which the arbitrator will frame his decree. We merely hold that in each of the grievances under discussion, he has the jurisdiction to reach a decision on the merits. Should his decision or the remedy exceed the bounds of his authority as established by the collective bargaining agreement, that abuse of authority is remediable in an action to vacate the award. See United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). That question "is for another day." International Ass'n of Machinists v. Hayes Corp., 296 F.2d 238, 244 (5th Cir., 1961).

### III.

Three of the union's grievances charge conduct on the part of the employer which the employer asserts can be evaluated only by the National Labor Relations Board. It is therefore argued that exclusive jurisdiction in the Board precludes adjudication or arbitration of the grievances, under the so-called preemption doctrine. See San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); Garner v. Teamsters Union, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953). Judge Palmieri found the preemption doctrine inapplicable and ordered arbitration of each grievance. We agree, and affirm the relevant portion of his order.

National Docket No. 4114 protests the assignment of certain bargaining unit work, assembly work on military guidance systems, to "laboratory technicians," persons outside the bargaining unit. The laboratory technicians did the assembly work alongside of employees who were within the bargaining unit, and it is asserted that the company refused to apply to them the provisions of the collective bargaining agreement and to recognize the union as their bargaining representative.

National Docket Nos. 4606–4611, consolidated as a single grievance, involves the assignment of work normally performed by the Maintenance Plumbers, employees within the union's bargaining unit, to employees in a different unit represented by a different union.

National Docket No. 4922, already discussed in detail, protests the removal of certain crystal processors from the production and maintenance unit and the conversion of their jobs from hourly pay to salary, without any change in their duties.

■ The Supreme Court has all but sounded the death-knell of the theory of exclusive NLRB jurisdiction in cases arising under section 301 of the Labor-Management Relations Act. See Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); Atkinson v. Sinclair Refining Co., 370 U.S. 238, 245 n. 5, 82 S.Ct. 1318, 8 L.Ed. 2d 462 (1962); Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 101 n. 9, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); Dowd Box Co. v. Courtney, 368 U.S. 502, 513, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962). The Court, in Smith v. Evening News Ass'n, 371 U.S., at 197, 82 S.Ct., at 70, 8 L.Ed.2d 462 discussed the other three cases cited above:

" * * * in these cases the jurisdiction of the courts was sustained although it was seriously urged that the conduct involved was arguably protected or prohibited by the Labor Management Relations Act and therefore within the exclusive jurisdiction of the National Labor Relations Board. In Lucas Flour as

well as in Atkinson the Court expressly refused to apply the preemption doctrine of the Garmon case; and we likewise reject that doctrine here where the alleged conduct of the employer, not only arguably, but concededly, is an unfair labor practice within the jurisdiction of the National Labor Relations Board. The authority of the Board to deal with an unfair labor practice which also violates a collective bargaining contract is not displaced by § 301, but it is not exclusive and does not destroy the jurisdiction of the court in suits under § 301."

The strong reliance upon arbitration as a means of peacefully and expeditiously resolving labor disputes, evidenced in the drafting of section 301 and in its interpretation by the Supreme Court, see e. g., Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), might be immeasurably frustrated were it within the power of a recalcitrant party to assert that his conduct, alleged to be in breach of contract, is also an unfair labor practice and within the sole domain of the NLRB; almost any breach of a collective bargaining agreement could successfully be garbed as an unfair labor practice. See Sovern, "Section 301 and the Primary Jurisdiction of the NLRB", 76 Harv.L.Rev. 529, 552 (1963). Congress, in refusing to make all breaches of labor contracts cognizable by the Board as unfair labor practices, see H.R.Rep. No. 510, 80th Cong., 1st Sess. 41–42, 52 (1947), contemplated that these would

be resolved by the "usual processes of the law." The fact that the Board's docket is notoriously overcrowded and that Board decisions are often slow in coming, that the remedies which the Board may fashion are often inflexible,[7] that time limitations or jurisdictional restrictions may effectively eliminate the possibility of administrative action, and that the grant of a hearing in any event is wholly within the discretion of the General Counsel of the Board—all of these factors are incompatible with an assertion that courts or arbitrators must necessarily be deprived of jurisdiction over disputes which in some form or other trench upon the possible, but as yet unexercised, use of power by the National Labor Relations Board. See Lodge 12, Int'l Ass'n of Machinists v. Cameron Iron Works, Inc., 257 F.2d 467 (5th Cir.), cert. denied, 358 U.S. 880, 79 S.Ct. 120, 3 L.Ed.2d 110 (1958); Dunau, "Contractual Prohibition of Unfair Labor Practices: Jurisdictional Problems", 57 Colum.L.Rev. 52 (1957); Meltzer, "The Supreme Court, Congress, and State Jurisdiction Over Labor Relations: II", 59 Colum. L.Rev. 269, 281–295 (1959); Sovern, supra.[8]

The fear of possible conflict with the NLRB can easily be exaggerated. The arbitrator himself might reject an interpretation of the contract which would permit the company to do or force it to do what the Board would enjoin. It is also clear that the mere rendition of an arbitration award in no way precludes the Board from exercising jurisdiction over the same subject matter upon the filing of a complaint alleging an unfair labor practice.[9] Moreover, the Board has exercised its discretion so as to fore-

---

7. See Dunau, "Contractual Prohibition of Unfair Labor Practices: Jurisdictional Problems," 57 Colum.L.Rev. 52, 68–72 (1957).

8. See also United Steelworkers v. New Park Mining Co., 273 F.2d 352 (10th Cir., 1959); United Elec. Workers v. Worthington Corp., 236 F.2d 364 (1st Cir., 1956); Independent Petroleum Workers v. Esso Standard Oil Co., 235 F. 2d 401 (3d Cir., 1956); Textile Workers

Union v. Arista Mills Co., 193 F.2d 529 (4th Cir., 1951); Note, 59 Colum.L.Rev. 153, 168–171 (1959); Note, 69 Harv.L. Rev. 725 (1956).

9. The Board's power to define and prevent unfair labor practices "shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise. * * *" 29 U.S.C. § 160(a), section 10(a) of the Labor Management Rela-

stall the possibility of abrasive conflicts between itself and the agencies responsible for the enforcement of section 301. Although not bound by the arbitrator's award, the Board will often defer to an award already rendered unless the arbitration procedure has been unfair or irregular, or the arbitrator's decision is repugnant to the purpose and policies of the labor act. See International Harvester Co., 138 N.L.R.B. No. 88 (1962);[10] Spielberg Mfg. Co., 112 N.L.R.B. 1080 (1955) And where arbitration is an available, but as yet unutilized, remedy for the resolution of problems arguably within the domain of the Board, that agency may choose not to exercise its jurisdiction until the contractual remedies have been exhausted. See McDonnell Aircraft Corp., 109 N.L.R.B. 930, 934–935 (1954); Crown Zellerbach Corp., 95 N.L.R.B. 753 (1951); Consolidated Aircraft Corp., 47 N.L.R.B. 694, 706 (1943), enforced as modified, 141 F.2d 785 (9th Cir., 1944). See also Dunau, 57 Colum.L.Rev. at 59–64; Wollett, "The Interpretation of Collective Bargaining Agreements: Who Should Have Primary Jurisdiction?", 10 Lab.L.J. 477 (1959); Levitt, "Interrelationships in the Interpretation of Collective Bargaining Agreements," 10 Lab.L.J. 484 (1959). In short, the virtues of "coordinate" jurisdiction of the court, the arbitrator, and the Board far outweigh the projected, and practically infrequent, vices. Rather than clash, the private interests advanced in the arbitral forum and the public interest advanced in the adminis-

trative forum, are far more likely to be complementary.

The company asserts that even if the preemption doctrine is not generally applicable in cases under section 301, the doctrine should apply where the questions raised by the grievances deal with the scope of the bargaining unit and similar matters of employee representation. It is true that only the Board can conclusively define the scope of the bargaining unit, just as the Board is the authority for the definition of unfair labor practices. But an arbitrator, in determining whether a party has violated the collective bargaining agreement, does not define an unfair labor practice; nor need he necessarily, in construing the employer's contractual obligation to recognize the union as the bargaining agent in the unit delineated by the Board, define that unit or alter its scope. The grievances under examination, and the contract provisions which will have to be interpreted in the course of arbitration, are quite familiar in the context of work-assignment disputes. See, e. g., Procter & Gamble Independent Union v. Procter & Gamble Mfg. Co., 298 F.2d 644 (2d Cir., 1962); International Tel. & Tel. Corp. v. Local 400, Int'l Union of Elec. Workers, 286 F.2d 329 (3d Cir., 1960). We are not persuaded that the possibility of some form of future conflict between the arbitrator's interpretation and a finding by the National Labor Relations Board in the area of representational disputes is so much more unsettling than in other areas as to call for a different result.[11]

---

tions Act. See Lodge 12, Int'l Ass'n of Machinists v. Cameron Iron Works, Inc., 257 F.2d at 473; United Elec. Workers v. Worthington Corp., 236 F.2d at 367–368.

10. "If complete effectuation of the federal policy [favoring arbitration] is to be achieved, we firmly believe that the Board, which is entrusted with the administration of one of the many facets of national labor policy, should give hospitable acceptance to the arbitral process as 'part and parcel of the collective bargaining process itself,' and voluntarily

withhold its undoubted authority to adjudicate alleged unfair labor practice charges involving the same subject matter, unless it clearly appears that the arbitration proceedings were tainted by fraud, collusion, unfairness, or serious procedural irregularities or that the award was clearly repugnant to the purposes and policies of the Act."

11. We are confirmed in our conclusion by the fact that Congress, in section 303 of the Labor Management Relations Act, 29 U.S.C. § 187, has expressly carved out an exception to the purported exclusive

In short, we hold that the possibility *vel non* of an exercise of jurisdiction by the Board is irrelevant in the circumstances before us. It was therefore unnecessary for Judge Palmieri to examine the merits of one of the grievances, National Docket Nos. 4606–4611, in order to determine whether the NLRB could be seised of jurisdiction over the purported jurisdictional dispute. It was not beside the point, however, for him to note that the only way the Board's jurisdiction could have been invoked was for the union to engage in an unfair labor practice proscribed by section 8(b) (4) (D); this simply points up the need for a peaceful, channelized, and expeditious means of settling work-assignment disputes, one which is not dependent upon the commission of unlawful acts and upon an often slow-footed exercise of discretion by an already burdened administrative agency. Although the ideal solution of this grievance would bring both conflicting unions before a single tribunal, see Sovern, 76 Harv.L.Rev. at 573–577, arbitration between one of them and the employer may nonetheless be a force for industrial peace.[12]

### IV.

Judge Palmieri refused to direct the arbitration of National Docket No. 4557,

reasoning that the clause of the collective bargaining agreement upon which it was founded is unlawful, and that to direct the employer to submit to arbitration would in effect compel the commission of an unfair labor practice. The union, on cross appeal, challenges the propriety of this phase of the district judge's order. National Docket No. 4557, as already noted, involves an assertion by employee Hatch that employee Haslam was improperly appointed to a vacancy to which he, Hatch, had prior claim because of seniority. The union asserts that by giving Haslam seniority, the employer has run afoul of Article XI(3) of the collective bargaining agreement:

"Employees who have been or may be transferred to jobs outside the bargaining unit may be returned to their former classification in the bargaining unit in accordance with total length of continuous service. Employees in any plant who have been certified in a bargaining unit not covered by this Agreement shall have no rights under this Agreement."

Judge Palmieri held this provision unlawful because designed "to preserve seniority rights of employees who leave

jurisdiction of the NLRB by permitting the courts to adjudicate suits against unions for violations of section 8(b) (4) of the act, 29 U.S.C. § 158(b) (4) (D). The latter section imposes restrictions upon the union's power in the area of work-assignment disputes, among other activities.

12. See Freight Drivers & Helpers v. Quinn Freight Lines, Inc., 195 F.Supp. 180 (D.Mass.1961). Although we disagree with the broad language of the Court of Appeals for the First Circuit, in Local 1505, Int'l Bhd. of Elec. Workers v. Local 1836, Int'l Ass'n of Machinists, 304 F.2d 365 (1st Cir.), cert. granted, 371 U.S. 908, 83 S.Ct. 255, 9 L.Ed.2d 169 (1962), judgment vacated per stipulation and case remanded to District Court with directions to dismiss as moot, 372 U.S. 523, 83 S.Ct. 886, 9 L.Ed.2d 965 (1963), that Court noted that "resolution of an ambiguity in its certification is a matter exclusively for the Board in spite of the fact

that preemption, as such, does not apply to actions under section 301 * * *."; of situations such as that before us, where the certification is unambiguous, the Court expressly reserved decision. See 304 F. 2d at 367 n. 2, 368. Other decisions arguably contrary to that we reach here have come only from the District Courts. See International Chem. Workers Union v. Olin Mathieson Chem. Corp., 202 F.Supp. 363 (S.D.Ill.1962); Local 1357, Retail Clerks Int'l Ass'n v. Food Fair Stores, Inc., 202 F.Supp. 322 (E.D.Pa.1961); In re American Buslines, Inc., 151 F. Supp. 877 (D.Neb.1957). We note, in passing, that even though the possibility of some future presentation of the representation issue to the NLRB should not forestall the courts from directing arbitration, it is not at all inconsistent for a court to defer its judgment should the Board already be seised of jurisdiction over a complaint by one of the parties to the contract. See Note, 59 Colum. L.Rev. at 170.

the unit but do not join another union while denying this privilege to employees who do join another union." In deciding that this discriminatory effect gave rise to an unfair labor practice, Judge Palmieri relied upon NLRB v. International Ass'n of Machinists, 279 F.2d 761 (9th Cir.), cert. denied, 364 U.S. 890, 81 S.Ct. 221, 5 L.Ed.2d 187 (1960).

■ We hold that the withdrawal of this grievance from arbitration was premature, and that it, along with all other grievances brought before us on this appeal, must be submitted to arbitration. As we understand the grievance, the union contends in part that Haslam was returned to the bargaining unit in a new position at a time when his former position was no longer in existence; this is said to render inoperative the seniority clause because Haslam was not "returned to * * * [his] former classification in the bargaining unit * * *." Surely this raises a question of contract interpretation meet for decision by the arbitrator. And the reasons for the inapplicability of the preemption doctrine require that arbitration be compelled here also. It will provide a ready means of healing the disruptive relationship between union and management; not only will it resolve questions going to the merits of the collective bargaining agreement, but as we have already said, it may have the "therapeutic values" of which the Supreme Court spoke in United Steelworkers v. American Mfg. Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). Even if we were to assume the NLRB's position to be as clear as Judge Palmieri thought, conflict with its policies is here wholly conjectural. It is by no means certain that the union's grievance will be found warranted. Further, if the arbitrator does uphold the union's construction of the seniority provision in question, he might himself decline to fashion an award based upon it for fear that he would encourage a practice banned by the labor act. We cannot construct a framework of legal principles governing arbitration on the theory that the arbitrator is ignorant or oblivious of the pronouncements of the Board and the courts. As another alternative which would not run afoul of the act, but would indeed further its purposes, the arbitrator might decide that the second sentence, which arguably discriminates against those anxious to exercise rights protected by the act, is severable and should be discarded but that the union's claim is supportable under the first sentence.

Only if none of these approaches is adopted by the arbitrator would it become necessary to determine whether a court should enforce an award that clearly compels an unfair labor practice. To do so now would be to "raise an unfair labor practice question prematurely and gratuitously." Wollett, "The Interpretation of Collective Bargaining Agreements: Who Should Have Primary Jurisdiction?", 10 Lab.L.J. 477, 482 (1959) (suggesting that even the Board should stay its hand until the arbitrator has given an authoritative interpretation of the contract).

In sum, we affirm those portions of the district court's order requiring arbitration of all grievances alleged to fall without the contractual authority of the arbitrator, all grievances alleged to fall within the exclusive jurisdiction of the National Labor Relations Board, and all "procedural" issues to be determined before reaching the merits. We reverse those portions of the order withholding from arbitration certain procedural issues which the Court itself determined, as well as the grievance the arbitration of which is said to compel the commission of an unfair labor practice.