The **MONROE SANDER CORPORATION**, Plaintiff-Appellant,

v.

David **LIVINGSTON**, individually and as the President of District 65, Retail, Wholesale and Department Store Union, AFL–CIO, Defendant-Appellee.

**LACQUER SPECIALTIES, INC.**, Plaintiff-Appellant,

v.

David **LIVINGSTON**, individually and as the President of District 65, Retail, Wholesale and Department Store Union, AFL–CIO, Defendant-Appellee.

Nos. 352, 353, Dockets 31025, 31026.

United States Court of Appeals Second Circuit.

Argued Feb. 10, 1967.

Decided May 3, 1967.

Lumbard, Chief Judge, dissented in part.

Irwin M. Rosenthal, New York City (Edward L. Skolnik, Stephen Lowey and Weiss, Bronston & Rosenthal, New York City, on the brief), for plaintiff-appellant Monroe Sander Corp.

George Moskowitz, New York City (Kirschenbaum, Moskowitz & Shapiro, New York City, on the brief), for plaintiff-appellant Lacquer Specialties, Inc.

Eugene G. Eisner, New York City, for defendant-appellee.

Before LUMBARD, Chief Judge, and SMITH and ANDERSON, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

The Monroe Sander Corporation and Lacquer Specialties, Incorporated brought actions under § 301 of the Labor-Management Relations Act, 61 Stat. 156 (1947), 29 U.S.C. § 185, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, which sought to stay permanently arbitration proceedings which had been demanded by District 65, Retail, Wholesale and Department Store Union, AFL–CIO. The United States District Court for the Southern District of New York, Charles H. Tenney, *Judge,* granting the union's motions for summary judgment under Fed.R.Civ.P. 56, dismissed the actions, and, after reargument on the merits, refused to vacate the original summary judgments. 262 F. Supp. 129. Sander and Lacquer now appeal from the dismissal of their actions. We affirm as to Sander and reverse as to Lacquer.

Sander owned and operated a Long Island City, New York, plant which, starting in the 1920's, had manufactured paints, lacquers, varnishes and enamels. Since 1964, Sander has been a wholly-owned subsidiary of the American Petrochemical Corporation. For over twenty-five years the union was the authorized bargaining representative of Sander's production employees. On June 15, 1964, Sander and the union executed a one year collective bargaining agreement, which, on October 11, 1965, was extended retroactively from June 15, 1965 to June 15, 1966.

On January 28, 1966, pleading continued inability to turn a profit even after the Petrochemical takeover, Sander informed the union that "we may find it necessary to close the company entirely, move to a different plant which lends itself to greater production efficiency or combine the products of this plant with another operation of the company either now in existence or which may be acquired in the future." Two months later, on March 30, in response to a letter of March 25 in which the union stated that it would seek modification of the collective agreement, Sander proposed to extend the existing contract to October 31, 1966, at which time it would expire in its entirety. Under the terms of this proposal, Sander would be allowed to transfer production to a new location at any time.

During early April, Sander met with the union as well as with its employees and explained its economic situation. The union demanded a new contract. At about the same time, Sander informed

the union that Petrochemical was considering acquiring Lacquer, a modern, non-union manufacturer of paints and lacquers, located in Newark, New Jersey, which had the capacity to service all of Sander's customers. Sander also notified its customers of the intention to take over Lacquer. Then, on April 22, the union replied to the company's March 30 proposal with a counter proposal for a two year contract containing, among other matters, substantial wage increases.

On April 28, Petrochemical agreed to acquire the business and assets of Lacquer contingent upon several conditions which were fulfilled in July. Thereupon, although the record is not clear on this point, Lacquer apparently became a wholly owned subsidiary of Petrochemical and seems to continue to do business under its original name. During late May and early June more meetings occurred with the union raising questions concerning the Moving and Basic Crew Clauses of the collective agreement. On June 4 Sander repeated its March 30 offer. Provided Petrochemical took over Lacquer, Sander also promised its employees preferential hiring at the Newark plant for a four month period commencing on June 15, the expiration date of the contract. Sander made this preferential hiring promise contingent as well on the availability of jobs, the prospect of which was not very promising. No positions were then available; and, even if Lacquer were to service Sander's customers, the New Jersey plant was capable of increasing productivity without hiring new employees.

With the union still demanding jobs at Lacquer, bargaining broke down. On June 7 the union served on Sander and Lacquer a demand for arbitration "concerning the Company's current breach and its threatened removal of its operations from Long Island City to Lacquer Specialties, Inc., in Newark, New Jersey, in derogation of the rights of the Union and the employees it represents." The

actions at bar, to stay the demanded arbitration, ensued.

It should be mentioned initially that no unfair labor practice issues are presented on this appeal. The union did file charges of § 8(a)(3) and § 8(a)(5) violations, 29 U.S.C. §§ 158(a)(3), 158(a)(5), with the Brooklyn Regional Office of the National Labor Relations Board. The Regional Director, however, refused to issue a complaint and dismissed the charges. Meanwhile, the union withdrew the charges. The Director approved this withdrawal and then withdrew his dismissal.

Accordingly, the questions for review are: whether there is an arbitrable dispute and, if so, what issues are to be arbitrated; who are the parties to the arbitration; whether our holding in McGuire v. Humble Oil & Ref. Co., 355 F.2d 352 (2d Cir.), cert. denied 384 U.S. 988, 86 S.Ct. 1889, 16 L.Ed.2d 1004 (1966), compels a stay of arbitration in this case.

### I.

The Supreme Court has ruled that "whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties,"[1] Atkinson v. Sinclair Ref. Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L.Ed.2d 462 (1962). In making this determination, a court must be mindful of the high place that arbitration holds in the national labor policy. "The present federal policy is to promote industrial stabilization through the collective bargaining agreement * * * A major factor in achieving industrial peace is the inclusion of a provision for arbitration of grievances in the collective bargaining agreement." United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 1350, 4 L.Ed.2d 1409 (1960) [footnotes omitted]. Thus, the rule is that unless the parties expressly exclude a matter, the court will

---

1. The District Court decided that there was an arbitrable dispute but failed to frame the issues for arbitration.

conclude that they intended to submit it to arbitration. "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." Id. at 582–583, 80 S.Ct. at 1353. "In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad." Id. at 584–585, 80 S.Ct. at 1354. See also Drake Bakeries Inc. v. Local 50, American Bakery & Confectionery Workers Int'l., 370 U.S. 254, 258–260, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962).

Here, the arbitration clause is as broad as any imaginable. It covers "Any controversy, claim or dispute or grievance of any nature whatsoever arising between the Employer and the Union or any employees, including but not being limited to questions of meaning, interpretation, operation, or application of any clause of this agreement, or concerning any breach or threatened breach of this agreement by either party or concerning any acts, conduct or relations of whatsoever nature between the Union and the Employer, directly or indirectly * * *." Moreover, there is no specific exclusionary clause. In fact, the parties did not even agree to the usual broadly-worded management functions clause.

■ After weeks of negotiations back and forth, the union demanded arbitration of the company's "current breach" and "threatened removal" during the term of the collective bargaining agreement.[2] Thus, contrary to appellants' assertion, this case is not controlled by Procter & Gamble Independent Union of Port Ivory, N. Y. v. Procter & Gamble Mfg. Co., 312 F.2d 181, 183 (2d Cir. 1962), cert. denied 374 U.S. 830, 83 S.Ct.

1872, 10 L.Ed.2d 1053 (1963), in which we refused to compel arbitration where "the activities on which the discipline was based, the disciplinary measures the propriety of which the union seeks to arbitrate, and the filing of the grievances all occurred in the interval between the termination date of the old agreement and the effective date of the new agreement." Also, insofar as the union demands arbitration of rights not limited to the duration of the collective agreement, whether or not the dispute and the demand for arbitration occurred after the expiration of the agreement is irrelevant. Piano & Musical Instrument Workers Union, etc. v. W. W. Kimball Co., 221 F.Supp. 461 (N.D.Ill.1963), rev'd 333 F.2d 761, rev'd per curiam 379 U.S. 357, 85 S.Ct. 441, 13 L.Ed.2d 541 (1964); Local Lodge No. 595, etc. v. Howe Sound Co., 350 F.2d 508 (3d Cir. 1965). Likewise immaterial is the present expiration of the collective agreement.

■■ In its brief to this court, the union describes the dispute as involving the issue of whether it has any "vested rights and benefits" in the New Jersey operation. The narrower issue, however, appears to concern job rights and is centered on the meaning of the Moving Clause of the agreement. That clause provides as follows: "The Employer agrees that he shall not *at any time* move his shop or operation from its present location to any place beyond reasonable commuting distance within the greater Metropolitan Area of New York. Reasonable commuting distance shall be construed as being within fifty (50) miles of New York City or Newark, New Jersey. In the event the plant is moved within the limits proscribed above and an employee *elects not to transfer* to the new location he shall be eligible for severance pay in accordance with Article 24 of this Agreement." [Emphasis supplied.] It should be noted, parenthetically, that unlike, for example, the Basic

---

2. We do not approve such a broadly-worded demand for arbitration, although we do not reverse here on that account, as we do not find that appellants here were misled.

Crew Clause, the Moving Clause is not tied to the term of the contract. Also, it is clear that parties to a collective agreement may provide for the survival of obligations beyond the term of the agreement. See Zdanok v. Glidden Co., 288 F.2d 99 (2d Cir. 1961), aff'd on other grounds, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962). Whether the union's position is also supported by the Basic Crew and New Workers Clauses would likewise be for the arbitrator. Also, whether the union "is right or wrong is a question of contract interpretation for the arbitrator." United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). We have "no business weighing the merits of the grievance * * *." Ibid. Accordingly, in furtherance of the national labor policy to promote arbitration, we interpret this very broad arbitration clause to which there are no exceptions as governing the dispute at bar.

■ We therefore require submission to arbitration of the general issue of whether the union is entitled to rights and benefits, especially jobs, at the New Jersey plant and the specific issue of the construction and interpretation of the Moving Clause. Appellants argue that this submission substitutes compulsory arbitration for collective negotiation. The short answer to this argument is that the union is only seeking to enforce any rights it may have under the expired contract and is not attempting to negotiate a new collective bargaining agreement.

## II.

■ The next question to decide is with whom the union must arbitrate. In its demand for arbitration, the union named both Sander and Lacquer. Any claim that the former owner of the New Jersey plant, then known as Lacquer Specialties, Inc., is bound to arbitrate would be groundless. It never contracted with the union, has sold its business and assets and is in the process of liquidation. In fact, in his

original decision of November 17, 1966, Judge Tenney ordered that "arbitration is to be deferred as to Lacquer until said corporation is formally acquired by Petrochemical." And, in his opinion of December 21 on reargument, the judge noted that he had been informed that the acquisition had transpired on the day of the oral argument of the original motion which appears to have been in July. Nevertheless, he did not grant the requested relief. We cannot determine from the record the form the acquisition took, although the old corporation was represented to be the appellant in No. 31026, Cal. #353, at the oral argument. The complaint in No. 31026, Cal. #353, sets forth an agreement to sell the assets and business of the corporation. The letter of Monroe Sander to its customers, Appellants' Appendix, p. 118(a), speaks of a contemplated plan to acquire Lacquer Specialties, Inc. through an exchange of stock. The court, in its opinion on reargument, stated that "Plaintiffs inform the Court that the sale of Lacquer to American Petrochemical Corp. had been consummated * * *." Consequently, we reverse and remand as to Lacquer only and order that the stay of arbitration issue forthwith but only as to the former owners. On the other hand, we affirm the dismissal as to Sander.

■ It would seem that Petrochemical, or its subsidiary, whichever now owns the New Jersey plant, would also be a proper party to the arbitration. In John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 551, 84 S.Ct. 909, 915, 11 L.Ed. 2d 898 (1964), the Supreme Court ruled that a survivor of a corporate merger was bound to arbitrate under a collective bargaining agreement entered into by the merged corporation provided that there was "any substantial continuity of identity in the business enterprise before and after" and the union did not "abandon its right to arbitration by failing to make its claims known." Courts of Appeals have applied the *Wiley* rationale where one business entity purchased assets from another. For example, the Third Circuit has held that a purchaser

corporation was bound to honor a collective contract entered into by the seller despite a clause expressly to the contrary in the purchase agreement. The court directed arbitration to proceed under the contract but somewhat qualified its mandate by stating that the arbitrator could give weight to any change of circumstance created by the transfer of ownership which might make adherence to any term of the agreement inequitable. United Steelworkers of America v. Reliance Universal Inc., 335 F.2d 891 (3d Cir. 1964). In a similar purchase and subsequent operation of a going concern, the Ninth Circuit held the purchaser bound by a collective agreement on the authority of *Wiley* and did not include the qualification detailed by the Third Circuit. Wackenhut Corp. v. Intern. Union, United Plant Guard Workers, 332 F.2d 954 (9th Cir. 1964). See also, McGuire v. Humble Oil & Ref. Co., supra, where this court indicated that it would follow the Third and Ninth Circuits but went on to decide the case on other grounds. Furthermore, in Piano & Musical Instrument Workers Union, etc. v. W. W. Kimball Co., 379 U.S. 357, 85 S.Ct. 441 (1964), reversing per curiam 333 F.2d 761 (7th Cir.), *Wiley* was held to be controlling where a corporation transferred operations from one plant to another which had not been operated before. There is no reason why the *Wiley* criteria for determining when one business entity is bound to arbitrate under a collective agreement entered into by another should not also apply to the situation at hand, a parent corporation's termination of one subsidiary plant and the purchase of another. So long as claims under the agreement are outstanding, it is immaterial that the agreement had expired when the final conditions of the Lacquer purchase were fulfilled.

◼ The question of whether there is "any substantial continuity of identity" between the Sander and Lacquer enterprises is to be answered by the Court, not the arbitrator. *Wiley*, 376 U.S. at 546–547, 4 S.Ct. 909. In that case, Interscience Publishers merged its operations which consisted of a single plant in New York City into Wiley, a much larger publisher, and Wiley retained most of the Interscience employees in New York City. 313 F.2d 52 at 53–54. In *Reliance Universal* and *Wackenhut*, supra, one entity purchased the business of another and continued the previous operation without significant change, employing substantially all of the seller's organized personnel. And, *W. W. Kimball* involved the transfer of manufacturing from a suburb of Chicago to Southern Indiana.

◼ Here, it appears that the district court was correct in finding that there was "any substantial continuity of identity" between the Long Island City and Newark operations. Both plants were located in the New York metropolitan area, both were engaged in the same line of business, the jobs in each were seemingly similar and Petrochemical planned to have the New Jersey plant service Sander's customers. Appellants point to the fact that none of the former Sander employees were hired in New Jersey. The relevance of the successor's engaging its predecessor's employees, however, is to show similarity of operations. *Wiley*, 376 U.S. at 481, 84 S.Ct. 909. In this case, Sander's offer of preferential hiring was some evidence to that effect. Furthermore, there was other adequate evidence of identity of operations. Moreover, the failure to hire Sander employees in New Jersey could not be determinative where, as here, that failure is the nub of the dispute.

◼ Consequently, Petrochemical's new subsidiary, apparently known as Lacquer, is bound to arbitrate unless the union has abandoned its right to arbitration by failing to make its claims known. Even though the union only named Lacquer and Sander, it did not abandon its rights against the new owner of the New Jersey plant.

### III.

◼ Appellants urge that our decision in McGuire v. Humble Oil & Ref. Co., supra, compels a stay of arbitration in this case. In *McGuire*, Humble Oil

purchased the fuel oil delivery business of Weber & Quinn, a retail coal and fuel oil enterprise. Of the 24 Weber & Quinn employees affected by the sale, Humble integrated 13 of them into a group of 355 workers. Local 553 of the Teamsters Union represented the 24 Weber & Quinn employees and the Industrial Employees Association represented the Humble employees involved. In a clarification proceeding conducted after the purchase, the National Labor Relations Board ruled that the Association was the exclusive bargaining representative of the former Weber & Quinn employees. 153 NLRB 1361 (1964). Citing the presence of a union at the successor, a fact which the Supreme Court noted was not present in *Wiley*, and the unit determination by the Labor Board, we refused to compel Humble to arbitrate with Local 553. Our rationale was that the conflicting interests of Local 553, the thirteen former Weber & Quinn employees, the Association and the bulk of Humble's employees would lead to "unrest and dissatisfaction" and that to order Humble to arbitrate with Local 553 might be tantamount to forcing Humble to bargain with a minority union in violation of the Labor Act.

▆▆ This is not the occasion to reexamine *McGuire*. See Note, 66 Colum.L. Rev. 967 (1966). Regardless of whether or not the same quantum of "unrest and dissatisfaction" and a similar threat of compelling the successor to commit an unfair labor practice are present, this case is controlled by *Wiley*. It makes no difference that jobs may be at stake here and seniority rights, pension funds, grievance and job security provisions, and severance and vacation pay were involved there. The *Wiley* Court recognized that problems might arise from the conflicting interests of the organized and unorganized employees. Also, the Court must have been aware of the un-

organized employees' right to refrain from union activities. 29 U.S.C. § 157. See NLRB v. District 65, etc., 375 F.2d 745 (2d Cir. March 24, 1967). Nevertheless, in ordering arbitration to proceed, the Court had "little doubt that within the flexible procedures of arbitration a solution can be reached which would avoid disturbing labor relations in the Wiley plant." 376 U.S. at 551–552 n. 5, 84 S.Ct. at 915. See also *Piano & Musical Instrument Workers Union*, supra. Should the award of the arbitrator, as distinguished from the process of arbitration, contravene national labor policy, it can be challenged in an action to vacate. See United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), Carey v. General Elec. Co., 315 F.2d 499, 507–508, 511–512 (2d Cir. 1963), cert. denied 377 U.S. 908, 84 S.Ct. 1162, 12 L.Ed.2d 179 (1964), and a decision requiring displacement of employees already employed at Lacquer before the takeover might well be considered to contravene national policy.

Reversed and remanded on the appeal of Lacquer Specialties, Inc., with instructions to determine the mechanics by which the New Jersey plant was acquired, and to stay arbitration as to the former owners who have disposed of their interest in the plant, by whatever designation now known, but to deny a stay of arbitration as to the present owner of the plant. Affirmed on the appeal of Monroe Sander Corporation.

LUMBARD, Chief Judge (concurring in part and dissenting in part):

I agree that Monroe Sander[1] is bound to arbitrate with the union concerning rights and benefits under the collective bargaining agreement between them which the union contends survived the expiration of the agreement and the closing of Monroe Sander's plant. How-

1. I do not believe that we should pass upon the question whether arbitration is proper as to new Lacquer, which has not been represented in these proceedings and has had no opportunity to contest, for example, the adequacy of notice to it. See John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 551, 84 S.Ct. 909, 915, 11 L.Ed.2d 898 (1964).

ever, I cannot agree that the union's demand that workers employed at the Lacquer plant when Petrochemical acquired it should be discharged, if necessary, to provide jobs for at least some former Monroe Sander employees is arbitrable. This demand is, as the Supreme Court specifically stated that the demands it held arbitrable in John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 555, 84 S.Ct. 909, 917, 11 L.Ed.2d 898 (1964), were not, "so plainly unreasonable that the subject matter of the dispute must be regarded as nonarbitrable because it can be seen in advance that no award to the Union could receive judicial sanction."

I recognize that, as the Court also stated in Wiley, 376 U.S. at 549–550, 84 S.Ct. at 914, "the preference of national labor policy for arbitration as a substitute for tests of strength between contending forces [can] be overcome only if other considerations compellingly so [demand]." It seems to me, however, that this case presents such considerations, as did McGuire v. Humble Oil & Ref. Co., 355 F.2d 352 (2 Cir.), cert. denied, 384 U.S. 988, 86 S.Ct. 1889, 16 L.Ed.2d 1004 (1966). In McGuire, as in Wiley, employees sought arbitration against a successor employer; this court found compelling against arbitration the considerations that possible preferential awards to those employees might cause "unrest and dissatisfaction" among other employees, and that such arbitration might constitute the unfair labor practice of bargaining with a group other than the certified bargaining representative.

The first of these considerations is even stronger in this case, as an award requiring the discharge of some or all Lacquer employees not only might but certainly would cause grave unrest and dissatisfaction among those employees. The inevitable, direct, and catastrophic impact such an award would have upon the Lacquer employees cannot be equated with the possible problems of special treatment as to seniority, pensions, and similar matters which the Supreme Court was confident could be avoided in Wiley. See 376 U.S. at 551–552 n. 5, 84 S.Ct. at 915. It is true, as the union urges, that the second consideration in McGuire is absent here, since the Lacquer employees are not represented by a union. However, the Lacquer employees' lack of representation also seems to foreclose them from effective participation in any arbitration between Monroe Sander and the union,[2] and thus to render it even less likely that the award the union seeks could be made acceptable to them.

A further compelling consideration against arbitration is that, as far as the Lacquer employees are concerned, a duty to arbitrate their retention of their jobs would indeed be, in the words of Wiley, 376 U.S. at 551, 84 S.Ct. at 915, "something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved." The teaching of Wiley is that a duty to arbitrate is not usually affected by a change in the ownership of a business, because a collective bargaining agreement "is more than a contract" and "calls into being a new common law—the common law of a particular industry or of a particular plant." United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 578–579, 80 S.Ct. 1343, 1351, 4 L.Ed.2d 1403 (1960). By contrast, the union's contention here is that a duty to arbitrate the continued holding of existing jobs was imposed upon the Lacquer plant by a change in ownership. An award directing the discharge of Lacquer employees to make room for former Monroe Sander employees not only would disrupt the established "common law" of the Lacquer plant, but would do so in a manner which the Lacquer employees can hardly have foreseen, and which they might well have

2. Compare Bernstein, Nudging and Shoving All Parties to a Jurisdictional Dispute into Arbitration: The Dubious Procedure of National Steel, 78 Harv.L.Rev. 784 (1965); Jones, On Nudging and Shoving the National Steel Arbitration into a Dubious Procedure, 79 Harv.L. Rev. 327 (1965).

sought to prevent by organizing or by agreement with old Lacquer if they had. Such a result would completely contravene the national labor policy of encouraging stable and peaceful industrial relations.

Neither in *Wiley* nor in the cases following it did such established and weighty interests of other employees militate against a demand for arbitration. Most cases following *Wiley*, like *Wiley* itself, involved successor employers at the same plant. See, e. g., United Steelworkers of America v. Reliance Universal Inc., 335 F.2d 891 (3 Cir. 1964); Wackenhut Corp. v. Intern. Union United Plant Guard Workers, 332 F.2d 954 (9 Cir. 1964). In Piano & Musical Instrument Workers Union, etc. v. W. W. Kimball Co., 221 F.Supp. 461 (N.D.Ill.1963), rev'd, 333 F.2d 761 (7 Cir.), rev'd per curiam, 379 U.S. 357, 85 S.Ct. 441, 13 L.Ed.2d 541 (1964), arbitration was directed where an employer shut down its plant and transferred production to a newly built plant. In such a case, and possibly in cases where production is transferred to an existing plant already owned by the same employer, see Feinberg, Transfer and Sale of Plant Operations in Arbitration, 13 Lab.L.J. 625, 638–40 (1962), there is no clearly justified reliance interest of other employees which would be directly and adversely affected by the award sought. However, where such an interest is present, as it is in this case, *Wiley* does not support an order directing arbitration on the sole ground that the acquired plant manufactures similar products in the same metropolitan area as the discontinued plant.

The union appears to argue that arbitration of its demand for existing jobs should be ordered even if an award granting the demand could not be enforced, apparently on the ground that arbitration even of a baseless claim may contribute to industrial peace. As a general proposition, this argument has been accepted by many commentators,[3] and finds some support in decisions of this Court. See Torrington Co. v. Metal Prods. Workers Union, 362 F.2d 677 (2 Cir. 1966); Carey v. General Elec. Co., 315 F.2d 499, 504–508 (2 Cir. 1963), cert. denied, 377 U.S. 908, 84 S.Ct. 1162, 12 L.Ed.2d 179 (1964). But whether or not it is generally valid, the argument is clearly invalid here, as it was in *McGuire,* because the very process of arbitrating the union's demand for existing jobs at Lacquer would lead to unrest and dissatisfaction among the Lacquer employees. Any contribution arbitration of this demand would make to industrial peace among former Monroe Sander employees would seem more than counterbalanced by the distress it would cause the Lacquer employees.

Thus I would expressly exclude from the questions to be decided by the arbitrator the union's demand that Lacquer employees be discharged to provide jobs for at least some former Monroe Sander employees.

With the reservation noted in footnote 1, I concur in the remainder of the Court's decision.

3. See, e. g., Hays, Labor Arbitration, A Dissenting View 80–83 (1966); Meltzer, The Supreme Court, Arbitrability, and Collective Bargaining, 28 U.Chi.L.Rev. 464, 471–77 (1961); Wellington, Judicial Review of the Promise to Arbitrate, 37 N.Y.U.L.Rev. 471, 472–77 (1962).